## COMMONWEALTH vs. JOHNNY DIAZ.

Middlesex. November 6, 2008. - February 24, 2009.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Criminal,* Motion to suppress, Instructions to jury, Confrontation of witnesses, Assistance of counsel, New trial, Capital case. *Constitutional Law,* Assistance of counsel, Confrontation of witnesses. *Evidence,* Consciousness of guilt, Hearsay, Prior misconduct. *Error, Harmless. Self-Defense. Identification.*

A trial court judge, in ruling on a criminal defendant's motion in limine seeking to exclude statements made by the defendant during a taped police interview, correctly found that the defendant understood and waived his Miranda rights and that his statements were voluntary and the product of a rational intellect [272-273]; moreover, the admission at trial of certain statements made during the interview, in which the defendant unequivocally denied committing the crime, while error, was harmless beyond a reasonable doubt, where the evidence of the defendant's denials did not harm the defendant's case, which was premised on misidentification; and where the Commonwealth introduced overwhelming evidence against the defendant [273-275].

No substantial likelihood of a miscarriage of justice arose from the admission in evidence at a criminal trial of a statement made by the defendant in the presence of police officers, where nothing in the record indicated that the defendant made the statement in response to police interrogation. [275-276]

At a murder trial, the jury's consideration of certain taped portions of the defendant's police interview, which contained references by the police to the fact that unnamed "people" had identified the defendant at the scene of the crime, neither created a substantial likelihood of a miscarriage of justice nor violated the defendant's confrontation rights, where the statements, although hearsay, were rendered insignificant by the testimony of four witnesses at trial who identified the defendant as the shooter, and by other overwhelming evidence of the defendant's guilt. [276-279]

At a murder trial, no error arose from the judge's admission in evidence of statements from the victim about the defendant's car being stolen, where the statements were not offered for their truth and were necessary for the Commonwealth to present as full a picture as possible of the reason for the confrontation between the victim and the defendant. [279-280]

At a murder trial, the judge did not err in declining to instruct the jury on the use of excessive force in self-defense, where the evidence, viewed in the light most favorable to the defendant, did not permit at least a reasonable doubt that the defendant believed that he was in imminent danger of death or seriously bodily harm, from which he could save himself only by using deadly force. [280]

A criminal defendant failed to demonstrate that his trial counsel had rendered ineffective assistance by failing to object to certain hearsay statements [281] and evidence of prior bad acts [282] that were not likely to have influenced the jury's conclusion; by failing to seek to suppress a taped interview of the defendant that allegedly was obtained in violation of the defendant's right to a telephone call as provided in G. L. c. 276, § 33A [282-283]; or by failing to request a jury instruction that was not required by the evidence [283-284].

A trial court judge properly exercised his discretion in denying a criminal defendant's motion for a new trial without holding an evidentiary hearing. [284]

INDICTMENT found and returned in the Superior Court Department on September 20, 2001.

The case was tried before *Peter W. Agnes, Jr.*, J., and a motion for a new trial, filed on September 7, 2006, was considered by him.

*Kathleen M. McCarthy* for the defendant.

*Jessica Langsam*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury convicted the defendant, Johnny Diaz, of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel, the defendant appeals from his conviction and from the denial of his motion for a new trial. He claims that his statements during an audiotaped police interview were improperly admitted because his waiver of Miranda rights was not valid and because his replies to certain questions constituted a denial; the admission of questions in the police interview referring to unnamed "people" who identified the defendant at the scene violated his confrontation rights; the judge should not have admitted evidence of prior bad acts; the judge committed prejudicial error by failing to instruct the jury on the use of excessive force in self-defense; and the defendant was denied the effective assistance of counsel. He also maintains that the judge impermissibly denied his motion for a new trial without holding an evidentiary hearing. Finally, the defendant requests that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the verdict or order a new trial. We affirm the conviction and the order denying the motion for a new trial, and we decline to exercise our power to alter the verdict.

1. *Facts and background.* We summarize the facts the jury
could have found, reserving further details for discussion of the
issues raised. On May 12, 2001, the victim was shot to death in
Lowell at approximately 3 p.m. Immediately prior to that, the
defendant had stopped at the apartment of Edwin and Jose Al-
cantaro, two brothers, and retrieved two guns Jose had been
keeping for him. The defendant put the guns, one of which had
gray tape on the handle, in the car he was driving. The defendant
said that the car, a gold Mitsubishi, belonged to his cousin and
offered to give the brothers a ride.[1]

As they drove on Merrimack Street in Lowell, a white car
came up beside them and the driver, the victim, asked the
defendant who owned the gold car. The defendant said that it
was his cousin's car. The victim responded that *his* cousin's car
had been stolen and that the defendant's car looked just like the
stolen one. The victim asked to see the registration for the car.
The defendant produced some documents and showed them to
the victim. The victim responded by calling the defendant a thief
and threatening to call the police. While the defendant was still in
his car, the victim punched the defendant in the mouth. At some
point thereafter, the defendant got out of the car.

Three people in a Jeep Cherokee vehicle came upon the scene.
At least two of the Jeep's occupants knew the defendant. They
sought to calm the victim down and suggested that he call the
police if he thought the car was stolen.

The defendant walked to the Mitsubishi he had been driving,
went into the front passenger seat, put his hand under the seat,
and pulled out a gun. He returned to the victim, aimed the gun at
him, and, touching his bleeding mouth with one hand, said, "How
about now? How about now?" The men from the Jeep yelled,
"No, Johnny, don't do that. No, no, don't do that," but the defen-
dant fired and the victim fell to the ground, moaning in pain. The
defendant said something to the effect of "Come on, come on,
hit me again," walked "really close" to the victim, and shot him
twice more in the chest. Then the defendant ran off.

Jose Alcantaro retrieved the other gun from the car, threw it

---

[1]One witness, a friend of the defendant, testified that he had seen the
defendant in the gold Mitsubishi earlier and that the defendant had admitted
that the car was stolen.

over a fence and returned home. Shortly thereafter, the defendant appeared there. His mouth was swollen and he asked Jose to lend him a shirt. The defendant also told Jose that he had hidden the gun in a baby carriage on the second floor in a building where a friend of Jose's lived.[2]

Several other witnesses corroborated some or all of the above facts. Edwin Alcantaro had been present when the defendant came to his house to obtain the guns from Jose. Edwin was also in the car during the initial confrontation between the defendant and the victim. He ran home after the victim punched the defendant. Later he saw the defendant arrive at his apartment with a split lip. Both the Alcantaro brothers identified the defendant in court; each testified pursuant to an agreement with the Commonwealth that he would not be charged with any offenses relating to this incident.

Two of the men in the Jeep Cherokee testified. One of them had lived in the same building as the defendant; the defendant visited him on Saturdays and referred to him as "uncle" and to his wife as "aunt." These men essentially confirmed portions of Jose's testimony, although they had driven from the scene after the defendant shot the victim the first time. Both men identified the defendant in court; one of them had earlier selected his picture from a photographic array as well. Each of the men recalled that the defendant was wearing a blue shirt.

A person who was driving in the area at the time of the incident saw people arguing and someone on the ground. He observed a person wearing a blue shirt walk to the man on the ground, fire two shots and then run away. The shooter had blood on his hands and his shirt. He identified the shooter from a photographic array as the defendant. Two other individuals who were in the area observed some or all of the above events, but were not asked to identify the defendant as the shooter. One of them remembered that the man firing the gun was wearing a blue shirt.

The day after the incident, the defendant telephoned the home of one of the men who had been in the Jeep Cherokee and asked if anyone had asked about him, either "people or the

---

[2]A gun was later recovered by the police from a baby carriage on the second-floor hallway of 77 Austin Street where a friend of Jose Alcantaro lived. See *infra*. A bloody blue shirt was draped over the baby carriage.

police," and if the man in the Jeep had talked with the police. The person who answered the telephone said "no" and hung up. At about the same time, the defendant told a friend that he had been punched in the face, but that he had "merked somebody," meaning that he shot someone. The friend noticed that the defendant had "broken lips."

On May 15, 2001, Jose Alcantaro took a Lowell police detective to 77 Austin Street to the second-floor landing. Inside a baby carriage the detective found a handgun whose handle was wrapped in duct tape. The gun was identified as a .32 caliber Colt semiautomatic pistol. A dark blue shirt with blood on it had been placed over the baby carriage.

Testing of the Colt pistol revealed human blood stains on the trigger guard which contained deoxyribonucleic acid (DNA) belonging to the defendant. He was also the source of the DNA found on a piece of bloody fabric cut from the front passenger seat of the Mitsubishi and the blue shirt that had been located on the baby carriage with the gun. Examination of shell casings found at the scene indicated that they were fired from the Colt weapon that had been stored in the baby carriage and that the bullets recovered from the victim's body came from the same weapon. The first two gunshot wounds were each independently fatal.

The defense was that Jose Alcantaro was the shooter. To this end, the defendant questioned the ability of witnesses to see the shooter and emphasized the facts that the gun and the blue shirt were found in the hall of an apartment where Jose's friend lived, that Jose could not remember what he was wearing the day of the killing, and that Jose and his brother Edwin fled to Connecticut after the shooting.

2. *Admissibility of defendant's audiotaped interview.* The defendant claims that the judge erred by denying his motion in limine[3] to exclude his taped police interview because he did not knowingly, intelligently and voluntarily waive his Miranda rights and because some of his answers to the police questioning constituted a denial. See *Commonwealth* v. *Nawn*, 394 Mass. 1,

_____

[3]The record does not indicate why this issue was raised by a motion in limine rather than a motion to suppress. We treat the motion as if it were a motion to suppress.

4-5 (1985) (unequivocal denial of crime by defendant charged with that crime is not admissible).

The judge held a hearing on the motion at the start of the trial and made his findings immediately thereafter. Two witnesses testified, Detective Hultgren and Officer William Bernard of the Lowell police department. The judge also listened to the recording of the police interview. We summarize the judge's findings. He credited the police testimony and found that, after the defendant was arrested for the murder of Luis Ayala on May 14, 2001, he was brought to an interview room at about 2 A.M. where Hultgren and a State trooper were present. Hultgren read the defendant the Miranda warnings in English. The defendant responded in English that he understood the warnings but would prefer the presence of a Spanish-speaking officer because he did not read English well and might not understand the police. Bernard, a Spanish-speaking officer, was contacted. While awaiting his arrival, the officers and the defendant engaged in small talk about sports and "matters unrelated to the murder." The conversation was friendly, in a "comfortable" room. The defendant was seated and not handcuffed. There was no "brandishing" of weapons, and the defendant was given coffee.

When Bernard arrived, he read the defendant the Miranda warnings in Spanish from a card which the judge found contained an accurate rendition of the warnings in Spanish. After each warning, the defendant responded in Spanish that he understood the right. The defendant signed a "so-called Spanish Miranda card" and his signature was witnessed by the other officers present.

The defendant agreed to continue speaking with the officers, and the ensuing portion of the interview (approximately thirty minutes) was tape recorded. During that time, the defendant never expressed interest in speaking to a lawyer; he did not indicate discomfort or distress, nor was he subjected to any threats by the police. He appeared to be alert and sober. The defendant said that he had consumed some beer the night before, but that he was not drunk at the time of the interview. There was no evidence that he had been drinking immediately preceding his arrest.

Most of the questions were put to the defendant in English. The defendant answered most of these questions in English. Sometimes the defendant expressed difficulty answering a ques-

tion. When that occurred, Bernard translated the question into Spanish, the defendant responded "without difficulty" in Spanish and Bernard translated the response back into English.

There was no indication that the defendant was suffering from a mental disease or defect, although he became "somewhat agitated or frustrated" when the police informed him that he had been identified by witnesses as the person who had shot Ayala. But the judge found that there was "no evidence that his will was overborne or that his statements were not the product of a rational intellect." Accordingly, the judge found beyond a reasonable doubt that the defendant understood and waived his Miranda rights and that his statements were voluntary and the product of a rational mind.

On the issue of the admissibility of the defendant's denial of guilt, the challenged statements were ones in which the defendant denied being in Lowell "within the past month and a half," being at the scene of the shooting, and driving a car on the night in question. The judge ruled that these statements did not constitute a denial, but rather were admissible as evidence of consciousness of guilt. Thus, the judge denied the motion in limine on both grounds and permitted introduction of the statements.

In reviewing a ruling on a motion to suppress evidence, see note 3, *supra*, we accept the judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. The weight and credibility to be given oral testimony is for the judge. *Id.* We "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

A valid Miranda waiver is one that is made knowingly, intelligently, and, in all respects, voluntarily. The Commonwealth bears a heavy burden to make this showing. *Miranda* v. *Arizona*, 384 U.S. 436, 475-476 (1966). *Commonwealth* v. *Murray*, 359 Mass. 541, 546 (1971). "To determine whether to admit a defendant's statements, a court must examine the totality of the circumstances, including the characteristics of the accused and the details of the interrogation." *Commonwealth* v. *Silva*, 388 Mass. 495, 501 (1983).

The defendant does not suggest that the police failed to administer accurate and complete Miranda warnings. Rather, he maintains that his statement was not voluntary because he had consumed beer the previous evening, did not understand the questions, and had been awake for twelve to fifteen hours. He also contends that his reply was "a complete denial" of the charge against him and therefore inadmissible. We consider each argument in turn.

First, the judge's findings that the defendant understood and waived his Miranda rights and that his statements were voluntary and the product of a rational intellect are supported by the evidence. The defendant received his Miranda warnings in English and then in Spanish. He signed a Miranda card that contained the warnings in Spanish. The defendant's answers during the interview indicated he understood the questions. Nothing about the situation suggested discomfort, coercion or distress. The defendant appeared sober and there was no evidence he was suffering from any mental disease or defect.

The defendant's second argument regarding his taped interview carries more force. He contends that the tape should not have been admitted because many of the statements contained therein constituted denials. For example, the defendant said several times that he did not shoot anybody, that he was not in Lowell on the date of the incident, and that he had not been driving a Mitsubishi. In addition, one of the last remarks by the police during the interview was, "You understand why you're here? You understand you're under arrest and we understand that you are saying you weren't there." These statements of denial (and their repetition by the police) should not have been admitted. Our "long-standing rule [is] that if a defendant is charged with a crime and unequivocally denies it, that denial is not admissible in evidence." *Commonwealth* v. *Nawn, supra* at 4, and cases cited.

The Commonwealth contends that because the statements were false, they are admissible as evidence of consciousness of guilt. If such were the case, the rule prohibiting evidence of statements of denial would be eviscerated, because every denial would then become admissible as evidence of consciousness of guilt. The Commonwealth cites *Commonwealth* v. *Lavalley*, 410

Mass. 641, 649-650 (1991), for support, but that case involved a different situation. There, the defendant had given one version of events to the police and then testified to a different version at trial. *Id.* at 647-648. We held that there was no error in instructing the jury that, if they found that the defendant had made false statements to the police, they could consider the statements as evidence of consciousness of guilt. *Id.* at 649-650. Here, rather than offering one version of events to police and another at trial, there was simply a denial of various police accusations.

We consider whether the error in admitting the denial evidence requires reversal of the conviction. The issue was preserved. It was the subject of a motion in limine on this ground and defense counsel objected when the tape was introduced. The error was of constitutional dimension. We cannot "distinguish between defendants who remain silent after being advised of their Miranda rights and those who deny the accusation after being so advised." *Commonwealth* v. *Nawn, supra* at 5. Where the error was of constitutional dimension and the issue was preserved, we must determine whether the error was harmless beyond a reasonable doubt. In determining whether an error is harmless we weigh the prejudicial effect of the improper evidence by considering such factors as "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions." *Commonwealth* v. *Waite*, 422 Mass. 792, 801 n.9 (1996), quoting *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

We address each of the factors. The premise of the defense was misidentification; evidence of the defendant's denial did not harm the defendant's case in this regard. The Commonwealth introduced the evidence, but the case against the defendant was overwhelming. There were several eyewitnesses to the crime. There was no question that the victim was shot to death. The only issue was the identity of the killer. Four people identified the defendant as the shooter. Although the defendant challenged the credibility of one, Jose Alcantaro (who could have been a suspect and who was testifying pursuant to an agreement with the

Commonwealth), two of the others were acquaintances of the defendant who happened upon the scene, and a third apparently was an impartial bystander. In addition, the defendant's DNA was on the handle of the gun that was the murder weapon, on blood stains in the front passenger seat of the Mitsubishi, and on the bloody blue shirt in the baby carriage where the gun was found (the defendant having been identified as wearing a blue shirt at the time of the killing). The defendant admitted to a friend that he had "merked" (killed) someone at the time his lip was cut, and also telephoned one person who had been at the scene of the shooting to ask if anyone had been asking about him and if the friend had spoken to the police.

The denials were mentioned in the Commonwealth's opening, contained in the taped interview, repeated again when Detective Hultgren testified, and mentioned in the closing argument. The judge instructed that the denials could be considered only as evidence of consciousness of guilt. However, a denial of a charge in circumstances such as these is not evidence of consciousness of guilt. Thus, the instruction given was not adequate to cure the prejudice to the defendant, and may in fact have aggravated it.

We are mindful that "we should apply the principle of harmless error with restraint," *Commonwealth* v. *Gilday*, 367 Mass. 474, 498 (1975), *S.C.*, 382 Mass. 166 (1980). Nevertheless, given the overwhelming evidence that the defendant was the shooter, including the several eyewitness identifications, the DNA evidence and the defendant's own admission to a friend that he had killed someone, we conclude that in this case the judge's error in admitting the defendant's statements of denial "did not influence the jury, or had but very slight effect," that is, that it was harmless beyond a reasonable doubt. See *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980), quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976).

As mentioned, the defendant was hit in his mouth by the victim at the start of the incident. The defendant makes a separate argument that his statement to the police that he cut his lip playing basketball should not have been admitted because it was made while he was talking with the detectives awaiting the arrival of Bernard, before he received the Miranda warnings in Spanish. This claim was not raised below and has been waived. We consider

it pursuant to our obligation to review the entire case for a likelihood of a miscarriage of justice. See G. L. c. 278, § 33E. It appears from the record that the defendant made the statement while he and the police were engaged in small talk about sports. There is nothing that indicates that the statement was made in response to interrogation. In addition, the defendant repeated the statement about the source of his cut lip after the Miranda warnings were administered in Spanish.[4]

3. *Confrontation rights.* The defendant next contends that the taped interview contained improper references by the police to the fact that "people" had identified him as the shooter, and that this violated his right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[5] He claims that these statements are testimonial "per se." See *Crawford* v. *Washington*, 541 U.S. 36, 51 (2004); *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 9

---

[4]The "cat out of the bag" theory, see *Commonwealth* v. *Mahnke*, 368 Mass. 662, 686 (1975), cert. denied, 425 U.S. 959 (1976), is not applicable to the second statement about the cut lip. "The cat-out-of-the bag line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition . . . of the earlier statement." *Id.* Here, there is no evidence that the prior statement was coerced.

[5]The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The right to confrontation is a "bedrock procedural guarantee [that] applies to both federal and state prosecutions." *Crawford* v. *Washington*, 541 U.S. 36, 42 (2004), citing *Pointer* v. *Texas*, 380 U.S. 400, 406 (1965).

The right of a criminal defendant to confront witnesses who testify against him is also protected by art. 12 of the Massachusetts Declaration of Rights, which provides that in a criminal trial "every subject shall have a right to produce all proofs that may be favorable to him [and] to meet the witnesses against him face to face." "Although, in some circumstances, art. 12 may provide a criminal defendant more protection than its Federal counterpart, see *Commonwealth* v. *Amirault*, 424 Mass. 618, 631-632 (1997); *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 541-542 (1988), in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment . . . ." *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006). "Although the defendant refers to art. 12 in his brief, he presents no independent argument that would persuade us to change this view." *Id.* See *Commonwealth* v. *Nesbitt*, 452 Mass. 236, 242-243 & n.10 (2008).

(2005), cert. denied, 548 U.S. 926 (2006).[6] He also argues that the statements were inadmissible hearsay.

The defendant was tried almost six months before the decision in *Crawford* v. *Washington, supra*, in which the United States Supreme Court announced a "new rule" concerning the confrontation clause. See *Whorton* v. *Bockting*, 549 U.S. 406, 427-418 (2007). Nevertheless, as the Commonwealth essentially concedes, the *Crawford* principles govern the disposition of the defendant's Sixth Amendment claims. *Griffith* v. *Kentucky*, 479 U.S. 314, 322-323 (1987) ("failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication").

The Supreme Court further refined the *Crawford* decision in *Davis* v. *Washington*, 547 U.S. 813 (2006). Following these cases, we held that the admissibility of an out-of-court statement is to be determined by a two-part inquiry. First, the statement is to "be evaluated for admissibility under normal evidence rules, i.e., whether it qualifies as a hearsay exception." *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 n.6 (2008). Second, "the statement must be appraised under the criteria of *Crawford-Davis* and *Commonwealth* v. *Gonsalves*, [*supra* at 3], to determine if it satisfies the confrontation clause of the Sixth Amendment." *Id.*

The statements at issue were plainly hearsay. *Commonwealth* v. *DelValle*, 351 Mass. 489, 491 (1966), *S.C.*, 353 Mass. 684 (1968). There were six references to the fact that "people" had identified the defendant as being "in the car" or "involved in the shooting." Contrary to the judge's conclusion that these statements were offered "to show their effect on the hearer," the police made statements that the jury could consider for their truth.

The Commonwealth contends that the statements are not hearsay because they were not offered for their truth, but "to show the defendant's response." Regardless whether such might have

---

[6]"[S]tatements made in response to questioning by law enforcement agents are per se testimonial, except where the questioning is meant to secure a volatile scene or to establish the need for or provide medical care," *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005), cert. denied, 548 U.S. 926 (2006), and are inadmissible unless the declarant was "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford* v. *Washington, supra* at 54.

been the Commonwealth's purpose, the judge did not instruct the jury that the statements were so limited. In any event, it is unlikely that a limiting instruction would have cured the hearsay problem because such an instruction would not have prevented the jury from assuming that the police knew something about the defendant's activities and that their information was true. Thus, the questions themselves basically become testimony by unidentified, out-of-court witnesses.

The defendant did not object on the basis of hearsay during the motion in limine or at trial.[7] Thus, he did not preserve a challenge to the statements on hearsay grounds. We consider the error to determine whether the jury's consideration of the hearsay created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Raymond,* 424 Mass. 382, 388 (1997). The hearsay references to "people" who identified the defendant as present at the scene or involved in the killing were, in our view, rendered insignificant by the fact that four people testified and identified the defendant as the shooter. It can reasonably be assumed that the four witnesses were some or all of the "people" whom the police had in mind. Even if the four people who testified were not the "people" to whom the police referred, the jury heard from equivalent witnesses. Thus, the hearsay was harmless. The vice at which the hearsay rule is aimed (the prevention of evidence by those not present at trial, see *Commonwealth* v. *DelValle, supra* at 491) was avoided. Particularly given the other overwhelming evidence of the defendant's guilt, see discussion in part 2, *supra,* admission of the hearsay evidence did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Johnson,* 429 Mass. 745, 749-750 (1999).

There remains the question whether the evidence violates the confrontation clause and the precepts of the *Crawford* decision. Because *Crawford* declared a new constitutional rule in criminal cases, it must be applied to cases pending on direct review. See *Griffith* v. *Kentucky, supra.* Since the alleged error was of constitutional dimension, we ask whether any error was harmless beyond a reasonable doubt. *Commonwealth* v. *Rosario,* 430 Mass. 505, 511 (1999). Even assuming that the statements refer-

---

[7]He did assert the objection in his motion for a new trial.

ring to "people" who identified the defendant are testimonial per se, and thus should not have been admitted, see *Crawford* v. *Washington, supra; Commonwealth* v. *Gonzales, supra*, the jury did not learn anything from these statements that they did not hear directly from the "people" themselves or from equivalent witnesses who were subject to cross-examination. Given this situation and the overwhelming evidence against the defendant, we conclude that in this case the judge's error in admitting the statements from the police "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980), quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976).

4. *Evidence of prior "bad acts."* The defendant argues that the judge improperly admitted evidence of the defendant's prior "bad acts." Specifically, the defendant alludes to evidence from several witnesses that the car the defendant was driving was stolen. These witnesses repeated statements of the victim to this effect. Defense counsel objected to the admission of most, but not all, of these statements on the ground that they constituted hearsay. Whether we consider the claim as preserved makes no difference; there was no error.

The statements from the victim about the car being stolen were not hearsay because they were not offered for their truth. They were admitted merely for the fact that they were said, and the jury were instructed accordingly. The statements were the reason for the confrontation; the victim's act of punching the defendant would have been inexplicable without the evidence that the victim had accused the defendant of stealing the car. And the shooting would have been inexplicable but for the fact that the victim accused the defendant of being a thief and physically attacked him.[8,9] See *Commonwealth* v. *Marrero*, 427 Mass. 65, 67 (1998), quoting *Commonwealth* v. *Bradshaw*, 385 Mass.

---

[8]Another witness testified that the defendant had said, prior to the shooting, that the car was stolen. Such a statement, of course, was admissible as an admission by the defendant. See *Commonwealth* v. *Rankins*, 429 Mass. 470, 475 (1999).

[9]The defendant claims also that the testimony that the defendant said to the victim, while holding a gun, "Come and punch me now" or "Come and get me now," was inadmissible as a prior bad act. There is nothing "prior" about this statement. The words were part of the entire shooting incident.

244, 269-270 (1982) ("The prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself").

5. *Excessive force in self-defense.* The judge instructed on self-defense. The defendant maintains that the judge should have instructed as well on the use of excessive force in self-defense. He claims that the instruction was warranted because the victim initially punched the defendant, the defendant was confronted by a group of people, and the defendant used no more force than was reasonably necessary. The judge did not instruct on excessive force in self-defense, and no objection was lodged at the conclusion of the charge. There was no error.

At the outset, no instruction on the subject was warranted. When deadly force is used, a self-defense instruction must be given "only if the evidence, viewed in the light most favorable to the defendant, permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in 'imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force.' " *Commonwealth* v. *Pike*, 428 Mass. 393, 396 (1998), quoting *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). "For such a belief to be reasonable, the victim must have committed some overt [threatening] act against the defendant" and there must be some evidence "that the defendant availed himself of all means, proper and reasonable under the circumstances, of retreating from the conflict before resorting to the use of deadly force." *Commonwealth* v. *Pike, supra* at 396, 398. The victim's punch of the defendant constitutes an overt act, but there was no evidence that the defendant availed himself of any, let alone all, means of retreat before shooting the victim. The defendant had access to an automobile; indeed, he entered the car to retrieve the weapon, but did not attempt to leave the scene. Instead, he walked to the car, obtained the gun, shot the victim, and then shot him twice more as he lay on the ground. In addition, there is no evidence that the defendant reasonably believed he was in danger of death or serious bodily harm. Because the defendant was not entitled to an instruction on self-defense at all, it follows that the judge did not err in declining to instruct on excessive force in self-defense. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 n.11 (1994).

6. *Ineffective assistance of counsel.* The defendant claims that his trial counsel was ineffective in several respects. He alleges that counsel did not file a motion to "exclude/redact" the defendant's taped statement on the grounds that it violated his confrontation rights under *Crawford* v. *Washington*, 541 U.S. 36, 54 (2004), contained multiple levels of hearsay, and contained references to "bad acts." The defendant also maintains that counsel was ineffective for not moving to suppress the taped statement due to the violation of his right to make a telephone call, see G. L. c. 276, § 33A. Finally, ineffective assistance is claimed for counsel's failure to request a jury instruction on "honest but mistaken identification." See *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983).

Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* at 682. Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not "constitute conduct falling 'measurably below' that of an 'ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

Citing *Crawford* v. *Washington, supra,* the defendant claims that counsel was ineffective for not objecting to statements by the police that "people" had identified the defendant as involved in the shooting. The defendant claims also that the statements were not admissible because they violated the hearsay rule. We have discussed these assertions. See part 3, *supra.* Because those who identified the defendant testified at trial, police mention of such a fact could not have had an impact. Accordingly, any failing by defense counsel was not "likely to have influenced the jury's conclusion." *Commonwealth* v. *MacKenzie, supra* at 517, quoting *Commonwealth* v. *Wright, supra* at 682.

The defendant additionally argues that counsel was ineffective for not objecting to those portions of the taped interview that mentioned prior bad acts by the defendant. He cites four instances: a question by the police asking whether the defendant attempted to sell a car stereo in the last few days; a remark by the defendant that he thought he was arrested because "they thinking I got drugs"; questions by the police as to whether the defendant ever owned a gun; and discussion about the defendant's girl friends and children. The questions and answers should have been excluded on the basis of their lack of relevance. Counsel should have sought to exclude them.[10] However, in our view, the resultant admission of these statements was not, on this record, of sufficient moment that they were "likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright, supra* at 682.[11]

The defendant also argues ineffective assistance because his attorney did not seek to suppress the taped interview on the ground that it was obtained in violation of his "telephone rights" as provided in G. L. c. 276, § 33A. That statute requires that a person held in custody be permitted to use the telephone and be informed of this right "forthwith" upon his arrival at the station. Only statements obtained as a result of the intentional deprivation of a defendant's right to make a telephone call must be suppressed. *Commonwealth* v. *Alicea*, 428 Mass. 711, 716 (1999).

This issue was raised by the defendant in his motion for a new trial. The defendant makes no claim that he was not advised of this right in English, but only that he was not provided the right in Spanish. The judge ruled that counsel was not ineffective for failing to argue for suppression of the taped interview on this ground for several reasons. First, the judge did not credit the defendant's allegations on this subject made in an affidavit that accompanied the motion for a new trial; moreover the judge

---

[10]Defense counsel did file a motion in limine for a limiting instruction regarding any involvement by the defendant in drug dealing. The motion was allowed, but no limiting instruction was requested or given at the time of admission of the defendant's statement that he thought the police had arrested him because of drugs.

[11]The fact that the questions were asked during a police interview in which the defendant voluntarily participated does not render the responses admissible at trial.

concluded even if he were to give credence to the allegations, the affidavit would not establish that any violation of the defendant's rights occurred. In any event, the judge found that there was no ineffective assistance, because there was no evidence of an intentional violation. Thus, the judge concluded, the tape would not likely have been suppressed on this ground and the defendant was not prejudiced by his attorney's inaction.

The judge's decision was not an abuse of discretion. The judge did not credit the defendant's affidavit that he asked in Spanish to use the telephone but was not permitted to do so and that he was directed to sign a paper written in English that he could not understand. There was no error in this decision. The defendant exhibited no signs of reluctance in his ensuing interactions with the police, or in the taped interview that occurred shortly after the telephone advisory. In addition, the defendant did not raise these claims until nearly three years after his conviction. The judge "did not have to accept [the allegations in the defendant's affidavit] as true even though they were undisputed." *Commonwealth* v. *De Christoforo*, 360 Mass. 531, 543 (1971). Nor is the judge required to accept an unsubstantiated claim of police wrongdoing made for the first time years later. *Commonwealth* v. *Denis*, 442 Mass. 617, 633-634 (2004). The judge was also justified in determining that, even if the affidavit were credited, no violation of the statutory right was shown. As the judge noted, although the defendant was limited in his ability to read English, the transcript of the defendant's taped interview indicated that the defendant could understand spoken English and there was no evidence that the telephone rights were not communicated to the defendant orally. Suppression would be required only if there were evidence of an intentional violation of the right to use the telephone, and the judge stated that, given the police's "diligent adherence to [the defendant's] Miranda rights and the calm tenor of the interview," it was unlikely he would have found such an intentional violation.

The defendant's final ineffective assistance claim is that he was entitled to a jury instruction on the possibility of an honest but mistaken identification, see *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983), and that counsel was ineffective for not requesting one. The judge instructed the jury that the Com-

monwealth must prove identification beyond a reasonable doubt, and he listed the factors that are useful in determining the accuracy of an identification witness. This was sufficient.

A "good faith error" instruction is not required when "the parties are so well known to each other . . . that under sufficient lighting and with appropriate physical proximity, the identification by the [witness] is either true or the [witness] is lying." *Id.* at 619. Here, three of the four identifying witnesses knew the defendant; two of them knew him well. It was daylight, and the individuals were all in close proximity during the incident. This case is unlike the *Pressley* case in which the victim had repudiated her earlier identification and there was "no evidence of the defendant's complicity" other than the victim's identifications. *Id.* at 620. Because such an instruction was not required here, failure to request one cannot qualify as ineffective assistance of counsel.

7. *Evidentiary hearing on motion for new trial.* The defendant's final claim is that the judge erred by not holding an evidentiary hearing on his motion for a new trial. Whether to hold a hearing on a motion for a new trial is within the judge's discretion, and the judge may rule on the motion for new trial without a hearing if "no substantial issue is raised by the motion or affidavits." *Commonwealth* v. *Wallis,* 440 Mass. 589, 596 (2003), citing Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). When, as here, the motion judge was also the trial judge, he may use his "knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing." *Id.* at 596, citing *Commonwealth* v. *DeVincent,* 421 Mass. 64, 69 (1995). We give substantial deference to a judge's conclusion in this regard. *Id.* at 596.

The judge's comprehensive and detailed statements of the facts and of the reasons for denying the motion for a new trial indicate that he was thoroughly conversant with the issues and with the relevant details. He considered the affidavits submitted and deemed that there had not been a substantial showing meriting an evidentiary hearing. See *Commonwealth* v. *Stewart,* 383 Mass. 253, 257-258 (1981). There was no abuse of discretion.

8. *Review pursuant to G. L. c. 278, § 33E.* We have con-

sidered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's verdict on the murder charge or to order a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*