## COMMONWEALTH *vs.* LEO WOMACK.

Essex. March 5, 2010. - July 13, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Jury and jurors. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Relevancy and materiality. *Jury and Jurors.*

Discussion of the proper standard to apply during appellate review of a trial court judge's admission in evidence of extrajudicial accusatory statements made in the presence of a criminal defendant [272-273], and statement that the prejudicial error standard is the proper standard to apply when reviewing the admission in evidence of a criminal defendant's denial, following a waiver of Miranda rights, of such statements [273-274].

At a criminal trial, no substantial likelihood of a miscarriage of justice, or prejudice, arose from the admission in evidence of certain extrajudicial accusatory statements made by police in the presence of the criminal defendant, where the accusations called for the admission or denial of a single fact (i.e., the identity of the perpetrator) that was the subject of other properly admitted evidence; where the police officer who made the accusatory statements was available at trial for cross-examination; and where other evidence supported a finding that the defendant actually committed the crime [274-276]; further, the admission in evidence of the defendant's denials of those statements did not cause prejudice [276].

A criminal defendant failed to demonstrate that the admission of evidence of three incidents occurring during his interrogation by police resulted in violations of his right to remain silent, where none of the incidents (the defendant's refusal to sign a writing, his failure to respond to a particular question, and his failure to mention a later-asserted alibi defense) constituted an exercise of his right to remain silent; therefore, the incidents were fairly subject to comment. [276-278]

A trial court judge did not err by not declaring a mistrial following an individual voir dire of the jury occasioned by allegations of juror intimidation, where the judge's voir dire comported generally with the procedure recommended by this court, and where the judge was entitled, in his discretion, to rely on each juror's statement that he or she remained unaffected and impartial and to allow them to remain seated. [278-281]

INDICTMENT found and returned in the Superior Court Department on March 24, 2004.

The case was tried before *Richard E. Welch, III,* J., and a motion for a new trial, filed on January 12, 2009, was also heard by him.

*Chauncey B. Wood* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

Spina, J. The defendant was convicted of felony-murder in the first degree. The underlying felony was an armed robbery while masked. The defendant appealed. He filed a motion for a new trial, which was denied by the trial judge. The appeal from the denial of the motion was consolidated with his direct appeal. On appeal he asserts error in (1) the admission of evidence of accusations by police during custodial interrogation, together with evidence of the defendant's blanket denials and his silence, and (2) the failure to declare a mistrial based on evidence of alleged juror intimidation. We affirm the conviction, affirm the order denying the motion for a new trial, and decline to reduce the degree of guilt or order a new trial.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of particular issues. At 3:49 A.M. on February 12, 2004, a man entered a 7-Eleven convenience store on Western Avenue in Lynn. He approached the store clerk and demanded that he open the cash register. He then stabbed the clerk once in the chest, stole about $403 in cash from the register, and fled. The store clerk died as a result of the stab wound. The incident was recorded by four security video cameras in the store. The perpetrator's facial features were partially concealed by a hat and towel around his head.

The videotape showed the defendant entering the store twice shortly before the incident, first at 3:12 A.M. and again at 3:17 A.M. His clothing differed from that worn by the perpetrator, but his height, weight, and gait were similar. The perpetrator wore a pair of sneakers that were similar, based on seventeen points of comparison by an expert witness, to sneakers worn by the defendant on January 18, 2004, as seen on a videotape showing him inside that 7-Eleven store on that date. During his first entrance on February 12, the defendant's coat was open, he wore nothing on his head, and he purchased a fruit drink. When he entered the second time his coat was closed, he wore a hat pulled

down over his face,[1] he made no purchase, and he appeared to be studying his appearance on the security camera monitor. At 3:37:59 and 3:41:09 A.M. on February 12, the defendant made two credit card purchases (gasoline, then cigarettes) at a Hess gasoline station (Hess) that was an eight- to ten-minute drive from the 7-Eleven store.

The defendant was arrested on February 14, 2004, after police obtained the videotape created by the security cameras in the store and recognized the defendant. Police searched his home for the clothing worn by the perpetrator, but found none. However, the defendant owned gloves, as well as sneakers, similar to those worn by the perpetrator.

The defendant waived his Miranda rights and spoke with police. He said he often went to this 7-Eleven store. When asked to describe his whereabouts in the early morning of February 12, the defendant began by saying he was awakened by the crying of his thirteen month old son. He yelled at his son, which resulted in an argument between the defendant and his wife. He said he left and went to the 7-Eleven store, arriving at about 2 A.M., and bought a fruit drink. He then went home. The defendant told the officers he had been inside the store only once that night. After he was confronted with photographs showing him inside the store a second time, he said he had returned to the store to buy diapers, then decided instead to return the next day after he received his paycheck. When asked why, after his first entrance into the store and before his second, he stood in the doorway for two seconds without entering, the defendant was silent, and the interview continued. He denied any involvement in the robbery and the killing. He never mentioned going to Hess after leaving the 7-Eleven store.

Before trial, the defendant was held as a pretrial detainee, sharing a cell with another inmate. That inmate testified that the defendant told him he had robbed the 7-Eleven store and stabbed the clerk. The inmate admitted that he expected consideration in his pending felony case from the district attorney in exchange for his cooperation in the prosecution of the defendant. He conceded that he could have reviewed the defendant's legal

---

[1]The defendant would later tell police, "It was cold out," in response to their request to explain the hat and closed coat.

papers when they shared a cell, but he said he never in fact did so.

The defendant offered alibi testimony of his wife to the effect that he went out between 2:25 and 2:30 A.M. on February 12, and returned within one hour.

2. *Accusations and denials.* The defendant argues that the judge erroneously admitted, over objection, two extrajudicial accusatory statements by police during his custodial interrogation, and his unequivocal denials of those accusations.

Shortly after his arrest, the defendant was interviewed at the Lynn police station by Lieutenant Gerald Stevens of the Lynn police department and Lieutenant Norman Zuk of the State police. He was advised of the Miranda rights, he waived his rights, and he agreed to speak to the officers. The interview was not tape-recorded.[2] Lieutenant Zuk testified that he advised the defendant that "he was under arrest because he was identified by Lynn police officers as being in the 7-Eleven store on Western Avenue just prior to a victim's being stabbed there, and that he fit the same height, weight and same gait, and some of the clothing that was observed was consistent." Defense counsel objected on grounds that this was an accusation, and the judge sustained the objection. There was no motion to strike Zuk's testimony.

The prosecutor rephrased his question and Lieutenant Zuk essentially repeated what he had said before, without objection. He further testified that he told the defendant that "the whole event was recorded on video and it was also recorded with audio, and you could hear him speaking and you could also hear the clerk scream when he was stabbed." The defendant responded by saying, "It wasn't me."

Later in his direct examination Lieutenant Zuk testified that he and Lieutenant Stevens showed the defendant three still photographs taken from the videotape. Lieutenant Zuk showed the defendant a photograph taken at 3:12 A.M. on February 12, depicting the defendant in the store with no hat and coat unzipped. He said to the defendant, "Here you are coming in, buying your drink. You're looking around." Defense counsel objected on

---

[2]The interview, but not the trial, occurred before our decision in *Commonwealth v. DiGiambattista,* 442 Mass. 423 (2004). Defense counsel expressly stated that he was not requesting the instruction described in that case. *Id.* at 447.

grounds that the statements were accusations. The objection was overruled. Lieutenant Zuk continued, testifying that he showed the defendant a second photograph, taken at 3:17 A.M., and a third photograph, taken at 3:49 A.M., and said to him, "Here you are coming in, seeing what you might look like with a hat on and your coat zipped up. And you're checking yourself out in the monitor. You didn't like what you saw, so you went in and then you went out and got a towel to cover your face. You came back, you robbed the place, and you stabbed the clerk." The defendant responded, "I saw the news. I saw the papers. I saw the reward. I didn't do anything. I bought a juice."

Extrajudicial accusatory statements made in the presence of a defendant, which he has unequivocally denied, are hearsay[3] and inadmissible[4] as evidence of guilt in the Commonwealth's case-in-chief.[5] See *Commonwealth* v. *Cruz*, 373 Mass. 676, 691 (1977); *Commonwealth* v. *Locke*, 335 Mass. 106, 115 (1956); *Commonwealth* v. *Twombly*, 319 Mass. 464, 465 (1946); *Commonwealth* v. *Anderson*, 220 Mass. 142, 145-146 (1915); *Commonwealth* v. *Trefethen*, 157 Mass. 180, 197 (1892).

The Commonwealth contends that this rule only applies when the entire statement consists of an accusation and a denial. We disagree. It applies equally to such exchanges made within the context of a larger statement. See *Commonwealth* v. *Diaz*, 453 Mass. 266, 273-274 (2009); *Commonwealth* v. *Locke, supra*; *Commonwealth* v. *Anderson, supra.*

The defendant contends that both accusations are fully preserved for appellate review. We disagree. Defense counsel successfully objected to the statement that contained the first allegedly accusatory statement, but he did not move to strike the statement. This

---

[3]In a somewhat parallel situation, an assertion contained in a question put to a witness at trial, and denied, typically results in an instruction that there is no evidence in a question answered in such a manner. See, e.g., *Commonwealth* v. *White*, 367 Mass. 280, 285 (1975). When an extrajudicial accusation that is denied is admitted in evidence, it becomes part of the record and may be considered by the jury for all purposes, unless struck or otherwise limited. There was no limitation here.

[4]We do not imply that police may not use accusatory statements as an investigative tool. Our rule simply excludes such statements from evidence if they were denied.

[5]They may be admissible for other purposes, such as evidence of the voluntariness of a statement. *Commonwealth* v. *Cruz*, 373 Mass. 676, 692 (1977).

matter is not preserved. See *Burns* v. *Brier*, 204 Mass. 195, 197 (1910); *Jarry* v. *Corsaro*, 40 Mass. App. Ct. 601, 608-609 (1996). Moreover, the prosecutor rephrased his question and there was no objection. Because the matter of the first alleged accusatory statement is not preserved, we review that matter under the standard of a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The objection to the second alleged accusatory statement, where Lieutenant Zuk resumed his description of his accusatory statement and the defendant's denial after counsel's objection was overruled, is preserved. We review that matter under the prejudicial error standard. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). See *Commonwealth* v. *Locke, supra*.

The defendant argues that his denials, distinct from the accusations, are a matter of constitutional dimension, and review should be conducted under the harmless beyond a reasonable doubt standard. He relies on *Commonwealth* v. *Diaz, supra* at 274, citing *Commonwealth* v. *Nawn*, 394 Mass. 1, 5 (1985) (*Nawn*). The issue before the court in *Nawn* was whether we should abandon our rule excluding from evidence both an accusation and a denial. The defendant in that case had unsuccessfully offered evidence of his denial of an accusation made by police, and he urged the court to treat evidence of his post-Miranda denials as different from evidence of his post-Miranda silence. *Id.* at 4-5. Noting that the defendant failed to offer any authority in support of his argument, the court concluded, without reference to any authority, that there was no reason to distinguish between such denials and silence for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 468 n.37 (1966), and affirmed the ruling that excluded the evidence. *Nawn, supra* at 5.

The court in *Nawn* could have affirmed the ruling on grounds that the accusation and the denial constituted inadmissible hearsay based on our long-standing common-law evidentiary rule. See, e.g., *Commonwealth* v. *Trefethen, supra*; *Commonwealth* v. *Henry*, 37 Mass. App. Ct. 429, 431-434 (1994). Significantly, the court did not distinguish between a defendant's exercise of the right to remain silent, which, as a constitutional matter, may not be admitted in evidence or commented on, see *Doyle* v. *Ohio*, 426 U.S. 610, 617-618 (1976), and a defendant's silence in response to a specific question after being advised of the

Miranda rights, waiving those rights, and agreeing to talk to police, which may be admissible in evidence and may be an appropriate subject for comment. See *Commonwealth* v. *Robidoux*, 450 Mass. 144, 160-161 (2007); *Commonwealth* v. *Senior*, 433 Mass. 453, 462-463 (2001); *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 513 (1992). See also *Commonwealth* v. *Thompson*, 431 Mass. 108, 118, cert. denied, 531 U.S. 864 (2000) (proper for prosecutor to comment on defendant's failure to ask appropriate questions during custodial interrogation following waiver of Miranda rights); *Commonwealth* v. *Lavalley*, 410 Mass. 641, 649 (1991) (defendant's failure to tell police in post-arrest statement that he was with rape victim and had intercourse with her constituted false statement, and prosecutorial comment thereon was permissible at rape trial where defense was consent).

To the extent that *Commonwealth* v. *Diaz, supra,* relied on *Nawn* and applied the harmless beyond a reasonable doubt standard to a defendant's denial of an accusation (as opposed to an exercise of his right to remain silent), after he waived his Miranda rights, it is overruled. Instead, we apply the prejudicial error standard long applied both to accusations and denials. See *Commonwealth* v. *Cruz*, 373 Mass. 676, 691-692 (1977); *Commonwealth* v. *Locke*, 335 Mass. 106, 115 (1956); *Commonwealth* v. *Twombly*, 319 Mass. 464 (1946); *Commonwealth* v. *Trefethen*, 157 Mass. 180, 200 (1892).

Turning to the claims of error, we need not define the precise limits of an accusation because Lieutenant Zuk's statements called for an admission or a denial of a single fact, i.e., the identity of the perpetrator, which was the only question in dispute. In each instance Lieutenant Zuk asserted first indirectly, then directly, that the defendant committed the robbery and homicide. If the defendant admitted either assertion, he effectively would have confessed to the crimes. See *Commonwealth* v. *Twombly, supra* at 465. These pointed assertions are clear accusations that the defendant robbed and killed the store clerk, both of which were unequivocally denied by the defendant.[6] As such, neither should have been admitted.[7]

---

[6]We reject the Commonwealth's suggestion that the denials may have been equivocal.

[7]Counsel should present this type of statement to the judge in a pretrial motion in limine.

There was no substantial likelihood of a miscarriage of justice, or prejudice, respectively, from the admission in evidence of these accusations because they were cumulative of other evidence. See *Commonwealth* v. *Locke, supra.* The jury heard evidence from Lieutenant Stevens and Lieutenant Zuk that, based on their examination of the videotape and the photographs, in their respective opinion the defendant and the perpetrator were similar in height, weight, and gait. The jury could examine the photographs and the videotape, which had been played during the trial and again during the prosecutor's closing argument, and determine for themselves if the person who robbed and killed the store clerk was the defendant. Indeed, the videotape evidence was the centerpiece of the prosecutor's closing, and he argued essentially what Lieutenant Zuk had stated as his theory of what occurred. The theory of the case was made more forcefully and compellingly by the prosecutor in his closing argument.

Also weighing against prejudice was the availability of Lieutenant Zuk, the accuser, for cross-examination about his observations of the videotape and photographs, and the availability of the videotape and the photographs as exhibits. Contrast *Commonwealth* v. *Twombly, supra* (accusations, denied by defendant, made by one who did not testify and not available for cross-examination were prejudicial and required new trial).

Other evidence supported a finding that the defendant actually committed the crime, including his statement to police (which the jury could have found implausible) that he zipped his coat and pulled his hat over his head before making his second entrance (but not his first entrance) because "[i]t was cold out." This evidence, together with his behavior as seen on the videotape during his second entrance, suggests that he was concerned about being identifiable on the video monitor, a concern the jury could determine generally is not shared by the ordinary convenience store patron. In addition, evidence that the defendant admitted being in the store once but changed his story after having been confronted with evidence of the still photographs from the video camera, together with his failure to mention Hess (which we discuss later), suggests he was purposefully withholding information he thought the police did not know. Collectively, this was evidence from which the jury could infer a guilty mind as to matters relevant to the case. The jury also heard evidence from a photographic

technologist employed by the Federal Bureau of Investigation, who analyzed the videotapes of the robbery and assessed the height of the perpetrator as five feet, eleven inches, the same height as the defendant; and there was expert testimony that sneakers owned by the defendant and the perpetrator were similar. There was no prejudice.

Neither did the admission in evidence of the defendant's denials cause prejudice. The core of any prejudice is more likely caused by admission of the accusations than the denials. The jury were able to hear evidence of his prompt, clear, and emphatic denials without his having to testify, something generally of great value to defendants. See *Nawn, supra* at 4-5 (defendant unsuccessful in attempt to overturn rule excluding accusations made to him, and his responsive denials). Cf. *Commonwealth* v. *Eugene*, 438 Mass. 343, 350-351 (2003) (defendant unsuccessful in attempt to admit favorable portion of his statement under doctrine of verbal completeness). Where the premise of the defense was misidentification, evidence of his denials did not likely harm his case. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994); *Commonwealth* v. *Locke, supra.*

We conclude there was no prejudice in the admission of the accusation and denial evidence.

3. *Defendant's silence.* The defendant contends that his right to remain silent was violated three times in relation to his interrogation by police. The first occurred after the defendant told the officers he went inside the store only once, in response to their question about the number of times he had entered. Lieutenant Zuk commented, "Leo, do you really want me to write that down?"[8] The defendant responded, "You can write down whatever you want because I'm not going to sign it anyway." He was then shown the photographs from the security camera and acknowledged he had entered twice. The defendant contends that his refusal to sign a statement was effectively an exercise of his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

The defendant asserts that his privilege against self-incrimination was violated a second time when testimony was admitted that, in response to Lieutenant Zuk's question why he had appeared

---

[8]Lieutenant Zuk was taking notes during the interview.

momentarily (two seconds) in the doorway of the store but did not enter, the defendant stayed silent.

The third instance cited by the defendant was his failure to tell police he had been to Hess. The prosecutor argued in closing that this failure was part of a false alibi strategy.

There was no objection; we review to determine if there were error and, if so, whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

Contrary to the defendant's claims, none of these incidents was an impermissible comment on an exercise of his right to remain silent, *Doyle* v. *Ohio*, 426 U.S. 610, 617-618 (1976), because the defendant did not exercise his right to remain silent. He waived that right after being advised of his Miranda rights, and he agreed to speak to police. At no time during the ensuing interview did the defendant exercise his right to remain silent.[9]

His statement to the effect that he had no intention of signing anything was nothing more than a refusal to sign a writing, which did not render the statement inadmissible. See *Commonwealth* v. *Pina*, 430 Mass. 66, 70 & n.8 (1999). Evidence of the defendant's refusal was relevant to show why there was no written statement, and the prosecutor never mentioned the defendant's refusal in his closing argument, much less use the refusal evidence for some improper purpose. Compare *Commonwealth* v. *Habarek*, 402 Mass. 105, 110 (1988), *S.C.*, 421 Mass. 1005 (1995) (exercise of right to remain silent admissible to show why interview ended abruptly).

The defendant's silence in response to Lieutenant Zuk's query into his reason for standing outside the store for two seconds without entering was not an exercise of his right to remain

---

[9]We have held that even a thirty- to forty-minute period of silence in the middle of a lengthy interview was not an exercise of a defendant's right to remain silent. *Commonwealth* v. *Sicari*, 434 Mass. 732, 748-749 (2001), cert. denied, 534 U.S. 1142 (2002). The Supreme Court has recently held that the Federal Constitution requires an invocation of the right to remain silent after a waiver of Miranda rights to be clear and unequivocal, and that a period of silence for three hours during a custodial interrogation does not effectuate an exercise of the right to silence. See *Berghuis* v. *Thompkins*, 130 S. Ct. 2250, 2260-2263 (2010). Here, the defendant's silence was the brief response to but one question in a quick paced, though not lengthy, interview. As such, it did not amount to an invocation of his right to remain silent.

silent, but a failure to respond to a particular question. As such it was admissible in evidence, *Commonwealth* v. *Senior*, 433 Mass. 453, 462-463 (2001), and subject to comment. *Commonwealth* v. *Thompson*, 431 Mass. 108, 118 (2000). See note 9, *supra*.

The final assertion of error concerns the prosecutor's comment on the defendant's failure to tell police during his interrogation that he had been to Hess after leaving the 7-Eleven store. When asked to describe his whereabouts during the early morning hours of February 12, the defendant never mentioned going to Hess. He telephoned his wife from the house of correction where he was being held and asked her if his credit card statement had arrived. He said it would show he was at Hess. He asked her to tell no one about it. The Hess purchases that appeared on his credit card statement, which were generated by the credit card apparatus at the Hess station, erroneously showed that the defendant's first credit card transaction occurred at 3:08 A.M., when in fact it occurred at 3:37:58 A.M., according to credit card company internal records. Relying on this evidence, the prosecutor argued that the defendant did not tell the officers about going to Hess because he was trying to set up a false alibi and eventually was unable to follow through because he was unaware that the Hess records were inaccurate.[10] This was fair argument based on evidence properly admitted. The prosecutor did not, contrary to the defendant's claim, shift the burden of proof to him or unfairly comment on his exercise of the right to remain silent. The defendant's silence was not an exercise of his right to remain silent, but a response to a specific question. Comment thereon was permissible. See *Commonwealth* v. *Lavalley*, 410 Mass. 641, 649 (1991). There was no error.

4. *Juror intimidation.* At the beginning of the fifth day of trial the judge told the parties he had received reports that spectators in the court room, possibly friends or family members of the defendant, made comments that were overheard by jurors 7 and 12 that were at best inappropriate, and "smack[ed] of juror intimidation." Before conducting an individual voir dire of

---

[10]Even had he known about the Hess records and used the actual credit card company records, there was enough time for him to return to the 7-Eleven store at 3:49 A.M. and commit the crimes.

the jury, the judge addressed the jury as a group, as set forth in the margin.[11]

The judge proceeded with an individual voir dire of the jury. All but four of the thirteen jurors heard nothing that caused them any concern. Juror 5 expressed being "a little concerned when I leave . . . . There seems to be a lot of people in the area that are just kind of staring down." Juror 5 stated such feelings would not create any difficulty in continuing to serve as a juror, and juror 5 assured the judge of continued objectivity. Juror 7 stated, "[W]hen we walk in or come back from lunch, they horde around the front of the building. They don't easily let you pass. And there are comments made . . . [such as] 'That's one of the jurors.' And then I just try and walk fast." Juror 7 assured the judge, "I still have the ability to make a rational decision." Juror 10 said a spectator from the court room asked, "How's your day?," when the juror walked out of the court house on the first day. The juror felt uncomfortable, but said it would not affect "my ability" to be fair and impartial. Juror 12 expressed discomfort the previous day over spectators "gathering outside the court room when we're trying to leave,

---

[11] THE JUDGE: "As I understand it from the court officers, at least two jurors have mentioned matters relating to their concerns of personal safety or invasion of their privacy in connection with this case. Am I correct about that, that certain concerns have been raised?

"Affirmative response."

"First, I want to address you on a very important matter, and then I'm going to ask to speak to each of you over at sidebar, individually, with the attorneys. . . . We cannot have a system of justice where people who are the judges, the jurors, feel afraid in some way, because, frankly, you don't render a fair verdict.

"So, I want to assure you of certain things. . . . [Jurors] often ask me the question, 'In some way we fill out these confidential questionnaires, do people know where we live?' Some of you may be concerned about it. And I always tell them that . . . I can understand these concerns. They're often the basis of movies even, not very good movies, but movies where some figure might approach a juror before, during or after a trial, but that this type of thing does not frequently occur at all."

The judge then assured the jurors that their confidential juror questionnaires were destroyed, and in any event did not contain their addresses or telephone numbers. He explained the details of a protocol he was instituting to ensure there would be no contact between jurors and spectators.

and the possibility that . . . they'll see where our cars are parked." The juror thought "they" might be related to the defendant by reason of skin color.[12] Juror 12 assured the judge that this experience would not affect the juror's ability to remain fair and impartial.

Defense counsel did not object to any portion of the voir dire. He expressed his separate satisfaction with each individual voir dire, and with the voir dire generally. He did not move for a mistrial.

The defendant argues that the judge erred by not declaring a mistrial. He reasons that the individual voir dire was inadequate because the judge failed to follow the prescribed course for deciding whether jurors have been exposed to extraneous information. His reliance on cases such as *Commonwealth* v. *Kincaid*, 444 Mass. 381, 392 (2005); *Commonwealth* v. *Casey (No. 1)*, 442 Mass. 1, 5-6 (2004); and *Commonwealth* v. *Fidler*, 377 Mass. 192, 200-201 (1979), is misplaced because they involve a postverdict inquiry into a jury's exposure to extraneous information during the jury deliberation process. That procedure has no application to extraneous matters presented before deliberations begin, as here.

"When a judge determines that the jury may have been exposed *during the course of trial* to material that 'goes beyond the record and raises a serious question of possible prejudice,' he should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect" (emphasis added). *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). "The initial questioning concerning whether any juror saw or heard the potentially prejudicial material may be carried out collectively, but if any juror indicates that he or she has seen or heard the material, there must be individual questioning of that juror, outside of the presence of any other juror, to determine the extent of the juror's exposure to the material and its effects on the juror's ability to render an impartial verdict." *Commonwealth* v. *Jackson*, *supra* at 800-801.

A judge has discretion in this area, including whether to

---

[12]The defendant and the people in question are African-American.

declare a mistrial. *Commonwealth* v. *Maldonado*, 429 Mass. 502, 506 (1999). We review a judge's ruling that the jury remained impartial and could disregard the extraneous information for an abuse of discretion. *Commonwealth* v. *Correa*, 437 Mass. 197, 201 (2002). Our focus is "on the jury in this case, not on a hypothetical jury." *Commonwealth* v. *Kamara*, 422 Mass. 614, 616 (1996). If we conclude that the judge abused his discretion, because there was no objection or motion for a mistrial, we will then inquire if that caused a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

The judge's collective inquiry of the jury comported generally with the procedure this court recommended in *Commonwealth* v. *Jackson*, *supra* at 800, but we think his prefatory remarks could have planted a fear in a juror's mind that otherwise did not exist. That said, any error likely would have been exposed by the ensuing individual voir dire, which also comported with the procedure called for in *Commonwealth* v. *Jackson*, *supra*.

Each juror was asked if he or she had overheard anything or received any communication that may have caused that juror any concern during the trial. Additionally, each juror was asked if he or she could continue to be objective and consider the case without any particular concern or fear. This would have included the judge's prefatory comments. The judge was entitled to rely on each juror's statement that he or she remained unaffected and impartial. See *Commonwealth* v. *John*, 442 Mass. 329, 339-340 (2004); *Commonwealth* v. *Gregory*, 401 Mass. 437, 444 (1988).

We give deference to the judge's decision allowing each juror to remain seated, *Commonwealth* v. *Kamara*, *supra*, which implicitly meant that he determined that each juror remained impartial. We conclude that the defendant has failed to show that any error in the manner in which the judge addressed the jury collectively resulted in a substantial likelihood of a miscarriage of justice, or that the judge abused his discretion in the manner in which he conducted the individual voir dire of the jury. We further conclude that there was no abuse of discretion in the retention of the jurors. There has been no showing of any need to declare a mistrial.

5. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the record. We see no reason to reduce the degree of guilt or grant a new trial.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*