## COMMONWEALTH *vs.* ALTON CLARKE.

No. 98-P-1361.

Suffolk. November 18, 1999. - January 27, 2000.

Present: PORADA, KAPLAN, & GILLERMAN, JJ.

*Practice, Criminal,* Admissions and confessions, Argument by prosecutor, Indictment, Instructions to jury, New trial. *Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions.

At the trial of a criminal case, the prosecutor's closing argument to the jury improperly implied that the defendant's post-Miranda silence was direct evidence of fabrication and that his declining to further answer police questions constituted consciousness of guilt: a new trial was required. [486-488]

At the trial of rape indictments, there was no error in the jury instructions regarding the alleged date and time of the offenses [488-489]; the defendant failed to demonstrate any prejudice in the wording of the indictments [489]; and the judge properly instructed the jury on fresh complaint [489].

INDICTMENTS found and returned in the Superior Court Department on May 4, 1995.

The cases were tried before *Elizabeth B. Donovan,* J.

*James M. McDonough* for the defendant.

*Jennifer M. Davis,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. The defendant, Alton Clarke, was charged with three counts of aggravated rape pursuant to G. L. c. 265, § 22(*a*), one count of assault by means of a dangerous weapon pursuant to G. L. c. 265, § 15B(*b*), and one count of kidnapping pursuant to G. L. c. 265, § 26. Clarke's first jury trial in January, 1997, resulted in a mistrial. After a second jury trial in August, 1997, Clarke was convicted on two counts of aggravated rape and on the kidnapping count. On appeal, he makes numerous claims including, principally, that the prosecutor impermissibly introduced testimony regarding the defendant's post-Miranda silence, and that the prosecutor improperly commented on that silence in his closing argument. We reverse.

1. *Background facts.* The jury could have found the following material facts. Sometime between March 6 and March 10, 1995, the complainant went to the home of her boyfriend, in Roxbury, around 9:30 P.M. Presently, the complainant left her boyfriend's house and started walking to Dudley Station for Chinese food. A burgundy Toyota passed her, then turned and pulled up onto the sidewalk in front of her. The defendant, whom the complainant did not recognize, got out of his vehicle, proceeded to the passenger side, pointed a black revolver at the complainant, and pushed her inside the automobile.

Clarke then got back into the vehicle and drove off. He kept the revolver pointed at the complainant while he was operating the vehicle. Eventually he pulled into the driveway of a white, split-level house. The complainant saw the number 22 on the front door. Clarke, using his key, opened the front door and told the complainant to go down the stairs leading to the basement. Clarke took her over to a couch, where he removed her clothes and his pants, shoes, and underwear. He pushed her down on the couch. He then pushed the revolver inside her vagina and moved it back and forth. After that, Clarke inserted his penis into her vagina and then into her mouth. The complainant screamed, but Clarke told her to "shut up."

When the assault ended, Clarke told the complainant to go into the bathroom and wash up. After she did this and got dressed, they left the house. As they were leaving, the complainant noticed a street sign labeled "Skyview Lane." The complainant directed Clarke to drop her off at her aunt's house, because she did not want him to know where she lived. She stayed with her aunt until about 9:30 P.M. the next evening, and then she called her boyfriend to come and pick her up. The complainant told her boyfriend that she had been raped, and she said that she did not want to go home. Her boyfriend took her to the Hyatt Regency Hotel in Cambridge, where they stayed for two or three days.[1]

About three weeks later, the complainant went to Boston City Hospital to visit her boyfriend's cousin, who had been shot. While she was there, she saw Clarke in the hospital corridor. She pointed Clarke out to her friends; they chased him through the lobby area and out of the hospital. They caught up with

---

[1]The complainant testified at trial that she did not call the police to report the rape because she was considering having someone go to Clarke's house to "hurt" him.

Clarke and "beat him." Throughout the confrontation, the complainant screamed: "That's him, that's the person that raped me." The complainant subsequently described to the police what Clarke had done to her.

The Commonwealth also introduced evidence that a woman named Norma Aldridge lived at 22 Skyview Road in Randolph. Aldridge testified at trial that she began dating Clarke in December, 1994, and that she ended the relationship sometime in February or March of 1995. She also testified that she owned two cars, a red Acura Integra and a red Subaru Legacy. While they were dating, Clarke would sometimes drive her to work, and he borrowed her red Subaru a few times.

Clarke testified in his own defense. He did not deny having an encounter with the complainant, but his version of what happened differed significantly. Clarke testified that on the evening of February 28, 1995, he went to Conway's in Mattapan to buy some chicken. While he was in the store, the complainant approached him and asked him if he wanted to "go out." He agreed, and they proceeded to have a discussion regarding her fee. Clarke agreed to pay her forty dollars "up front" and forty dollars when they reached their destination.

When they arrived at 22 Skyview Road, they went into the basement, and the complainant asked for the rest of the money. Clarke told her that he did not have the additional forty dollars, which upset her. He asked her to return the money that he had originally paid her, but she refused. He then retrieved the forty dollars from her purse, after which she started swearing and threatened to accuse him of rape. Clarke testified that he did not have sex with the complainant that night.

Clarke also testified that a few weeks later he was at Boston City Hospital because his wife was five months pregnant and was ill. As he was leaving the hospital, he was attacked by four males. He became scared, ran, and was later apprehended by a hospital security guard.

*2. Post-Miranda interrogation.* Detective Donna Gavin of the Boston police department's sexual assault unit testified at the trial that she interviewed Clarke at the police station after the incident at the hospital. She entered Clarke's holding cell and read him his Miranda rights. Clarke told Gavin that he was willing to speak to her.

Gavin first asked Clarke who lived in Randolph. He responded: "A girl, a friend, Norma," and he gave 22 Skyview

as her address. Clarke denied that he had ever taken a female guest to 22 Skyview. When Gavin asked him what type of car he drove, he initially stated that he did not drive, but he later said that he used to own a 1980 Toyota. She then asked him who owned the Subaru, and he said that Norma did.

Gavin also asked Clarke if he knew the complainant. He told her that he had never seen the complainant before. Gavin then asked him how the complainant would know the address of 22 Skyview. He responded that the security guards at Boston City Hospital had removed some of his papers from his wallet and that they had disclosed his personal life to her. When Clarke was asked how the complainant might have been able to describe the house at 22 Skyview Road, Gavin stated that his response was "that he is not guilty and that he has nothing to say about how she would know how to describe the house."[2] Gavin then stopped the questioning.[3]

Prior to trial, Clarke had filed a motion in limine to exclude the statements he made to Gavin, and, in particular, his response, quoted above, to the last question put to him by Gavin. He claimed that he was exercising his right to remain silent when he answered the question. The motion judge denied the motion and found that Clarke had knowingly and voluntarily waived his right to remain silent.

(a) *The* Doyle *problem.* Clarke argues on appeal that the denial of his motion to suppress (with its focus on the alleged inadmissibility of his last statement to Gavin), the admission of Gavin's testimony (including Clarke's last statement to her) at the trial over his objection, and the prosecutor's use of Gavin's testimony, over his objection, during closing argument deprived him of his right to due process and of his right to a fair trial. We discuss each of these claims separately.

---

[2]However, at the suppression hearing Gavin testified that Clarke's final statement was that "he didn't know how she could [describe the house] and that he had never seen her before and that he had nothing more to say." For the reasons stated in note 5, *infra*, the difference between Gavin's two versions is of no consequence.

[3]Clarke disputed Gavin's version of what was said at the interview. First, he claimed that Gavin never read him his Miranda rights. He also testified that when Gavin asked him if he had ever taken a female guest to 22 Skyview Road, he told her that he had picked up a prostitute on February 28, 1995, and had taken her there. He also testified that Gavin never asked him how the alleged victim would have been able to describe the house, and he denied that he said that he did not want to answer any more questions.

*Commonwealth* v. *Waite*, 422 Mass. 792, 798 (1996), teaches that while *Doyle* v. *Ohio*, 426 U.S. 610 (1974), precludes the use of the defendant's post-Miranda silence against the defendant, "[s]till, in a few situations evidence of silence is properly admitted because it is not 'used against' the accused." *Commonwealth* v. *Waite, supra.* The court cited *Commonwealth* v. *Habarek*, 402 Mass. 105 (1988), as an illustration. There the court wrote that the police officer's "testimony on direct examination concerning the defendant's request to end the interrogation was introduced in the context of the entire conversation, and was admitted so as not to leave the jury wondering why the interview ended abruptly." *Id.* at 110. Thus, in *Waite*, the court wrote, "[O]ne statement on direct examination simply put an abruptly concluded conversation in context." *Commonwealth* v. *Waite, supra* at 798. So it was here. Clarke, after answering a number of Gavin's questions, abruptly terminated the interview. Without Clarke's statement, Gavin's termination of her questioning was at best confusing, and at worst inexplicable. There was no error in the denial of the motion to suppress. For the same reason, and on the same authorities, there was no error in the admission of Clarke's last statement to Gavin at the trial.[4]

The *Doyle* problem continues, however.[5] "The sine qua non of a *Doyle* violation is the government's *use* of the defendant's silence against him." *Commonwealth* v. *Waite*, 422 Mass. at 798 (emphasis in original).

Clarke claims that his silence was used against him when the prosecutor made the following statements in closing argument:

---

[4]See *Commonwealth* v. *Waite*, 422 Mass. at 799 n.5 ("prosecutors and judges must make efforts to discern ways to present the questioning as complete, so as to prevent the need to explain a seemingly abrupt end to interrogation").

[5]The Commonwealth argues that Clarke's statement was not a clear invocation of his right to remain silent, and thus there is no *Doyle* problem. It is enough to point out that Gavin certainly understood the meaning of Clarke's statement, for she abruptly and permanently terminated her questioning of Clarke. See *Commonwealth* v. *Cobb*, 374 Mass. 514, 519 (1978) (defendant's statement, "I have nothing to say," held sufficient); *Commonwealth* v. *King*, 34 Mass. App. Ct. 466, 468 (1993) (defendant's statement, "I don't want to talk no more," held sufficient). Further, the motion judge made the subsidiary finding that "Clarke abruptly concluded the interview asserting he wanted to make no more statements." Cases cited by the Commonwealth are inapposite. See, e.g., *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 672 (1991).

"But then, when Detective Gavin said to him, how would she [the complainant] know, how would she be able to describe that house, *his [Clarke's] answer was, I don't want to talk anymore. I am not going to.* And, at that point in time, he realized that she was able to describe the inside and the outside of that house. She was able to know that it was 22 Sky View. And, at that point in time, he *changed his defense.* At that point in time, he came before you now and to say, no, she was a prostitute, and *concocted the whole story.*" (Emphasis added.)

The defendant objected; the objection was overruled. No curative instruction was given by the judge, and the prosecutor continued his summation:

"[W]hen she [Gavin] talked to him [Clarke], she asked him, how would the woman be able to describe that house. *And, at that point, I don't want to talk to you any further,* because at that point he knew that now she knew where he went, she knew the car, and she could describe that house. *So he could not say any longer it's an identification case. So he now comes to court and says, well, she was a prostitute.*" (Emphasis added.)

At the conclusion of the prosecutor's summation, the defendant moved for a mistrial; the motion was denied. No curative instruction was given by the judge.

Although a prosecutor may argue that the defendant's story is a fabrication, "the prosecutor may not elicit evidence of the defendant's silence . . . to argue that [this was] evidence that the defendant fabricated his story." *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 691 (1997). Furthermore, "it is a violation of due process to allow such silence, or the invocation of the right to remain silent, to be used as evidence of guilt." *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978). Here, the prosecutor's summation was designed to use Clarke's silence as direct evidence that he fabricated his testimony about the complainant. In making his argument, the prosecutor argued to the jury that Clarke stopped answering Gavin's questions because he realized that he had been caught in a lie, and for that reason Clarke "changed his defense." His comments also implied that if Clarke had been telling the truth when he was interviewed by the police, he would have continued to answer

Gavin's questions. Thus, the prosecutor improperly used Gavin's testimony regarding Clarke's silence to show consciousness of guilt on the part of the defendant — that "he was hiding relevant information from the police." *Commonwealth* v. *Peixoto*, 430 Mass. 654, 658 (2000). "Unmistakably, the prosecutor was trying . . . to *use* against the defendant his postarrest, postwarning silence" (emphasis in original). *Commonwealth* v. *Rendon-Alvarez*, 48 Mass. App. Ct. 140, 142 (1999). "This use of the defendant's silence 'struck at the heart of the defendant's story at trial.' We cannot properly conclude that the error was harmless."[6] *Ibid.* (citation omitted). See *Commonwealth* v. *Egardo*, 426 Mass. 48, 53 (1997) ("[T]he Commonwealth's use of the defendant's postarrest silence against him violated one of the defendant's core constitutional protections"); *Commonwealth* v. *Mahdi*, 388 Mass. 679, 698 (1983) ("The nature of a *Doyle* error is so egregious that reversal is the norm, not the exception"). We conclude that there "is a reasonable possibility that the error might have contributed to the jury's verdict." *Commonwealth* v. *Alphas*, 430 Mass. 8, 23 (1999) (Greaney, J., concurring), cited with approval in *Commonwealth* v. *Peixoto*, *supra* at 660. Clarke is entitled to a new trial. *Commonwealth* v. *Rendon-Alvarez*, *supra*. Contrast *Commonwealth* v. *Peixoto*, *supra* at 661 (prosecutor abandoned offensive line of questioning and judge gave forceful curative instruction).

3. *Other issues.* We briefly decide several other issues on appeal which may arise if the Commonwealth chooses to retry the defendant.

The stone from a ring was found by Norma Aldridge between the cushions of the couch in her basement. To establish its admissibility, Aldridge sufficiently identified the stone as coming from a ring worn by the defendant. It was for the jury to decide how much weight, if any, to give Aldridge's testimony.

There was no error in the jury instructions regarding the alleged date and time of the offense. General Laws c. 277, § 35, provides that a variance between the allegations and proof shall

---

[6]Defense counsel objected to one of the two instances quoted above in which the prosecutor stepped over the boundaries of permissible advocacy. Defense counsel also moved for a mistrial at the end of the prosecutor's closing, arguing that the prosecutor improperly used Clarke's silence as evidence of guilt. We conclude that the defendant's appellate rights were adequately preserved as to this point. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 34 (1992).

not be a ground for the defendant's acquittal "if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence." Because the date and time of the offense are not elements of the crime of aggravated rape or of any of the other crimes with which Clarke was charged, "in the absence of prejudice the defendant was not entitled to an acquittal even if the jurors found a variance between the date alleged in the indictment[s] and the date proved." *Commonwealth* v. *Day*, 387 Mass. 915, 922 (1983). See *Commonwealth* v. *Domaingue*, 397 Mass. 693, 703 (1986) (motion for required finding of not guilty properly denied where complainant's testimony regarding the incidents varied somewhat from the dates alleged in the indictments and where the dates and times of the alleged offenses were not elements of the crimes).

Clarke has failed to show how he was prejudiced by the wording of the indictments or by the jury instruction. At his second trial, Clarke had the benefit of the Commonwealth's evidence at the first trial, including information about the time, place, and the circumstances of the alleged incidents. Thus, to the extent that his assertion of prejudice implicates due process concerns, we conclude that he had sufficient knowledge about the charges against him to prepare adequately his defense at the second trial. See *Commonwealth* v. *Conefrey*, 420 Mass. 508, 511 n.6 (1995).

Clarke contends that the trial judge erred by failing to give his requested fresh complaint instruction.[7] Here, the trial judge gave a proper fresh complaint instruction. See *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992); *Commonwealth* v. *Scanlon*, 412 Mass. 664, 673-674 (1992). The trial judge need only give an instruction which accurately states the law, and need not employ the precise language requested by the defendant. See *Commonwealth* v. *Williams*, 388 Mass. 846, 857 (1983); *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995). There was no error.

4. *Conclusion.* The judgments are reversed and the verdicts are set aside.

*So ordered.*

---

[7]Clarke asked that the trial judge instruct the jury as follows: "A fresh complaint doctrine is justified on the ground that a victim's failure to make prompt complaint might be viewed by the jury as inconsistent with the charge of sexual assault."