## COMMONWEALTH vs. IVAN LORENZO SOSA.

No. 10-P-484.

Suffolk. December 7, 2010. - March 18, 2011.

Present: RAPOZA, C.J., MEADE, & MILKEY, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Admissions and confessions, Cross-examination by prosecutor, Instructions to jury. *Evidence,* Admissions and confessions, Self-defense. *Witness,* Cross-examination.

At a murder trial in which the defendant proceeded on a theory of self-defense, the prosecutor's questioning during cross-examination of the defendant, in which the prosecutor sought to emphasize that the defendant had not told his coworkers that the victim allegedly had attacked the defendant, did not unfairly comment on the defendant's right to remain silent, where the omission or silence occurred prior to the defendant's arrest and prior to his being advised of the Miranda warnings, and where the defendant did not in fact remain silent after receiving the Miranda warnings. [109-113]

At a murder trial, the judge correctly instructed the jury on their consideration of testimony by a witness who testified at trial that his grand jury testimony provided the true version of the conversation between the defendant and the victim. [113-114]

At a murder trial, the jury instruction on self-defense was not deficient on the subject of the defendant's duty to retreat. [114-116]

INDICTMENT found and returned in the Superior Court Department on November 9, 2006.

The case was tried before *Linda E. Giles,* J.

*David M. Skeels,* Committee for Public Counsel Services, for the defendant.

*Kris C. Foster,* Assistant District Attorney (*Ian Polumbaum,* Assistant District Attorney, with her) for the Commonwealth.

MEADE, J. The defendant was indicted for murder in the second degree of Carlos Borrero, in violation of G. L. c. 265, § 1. After a jury trial, he was convicted of voluntary manslaughter. On appeal, he claims that the prosecutor's cross-examination of

him violated *Doyle* v. *Ohio*, 426 U.S. 610 (1976) (*Doyle*), that the judge erred by refusing to instruct the jury about the probative value of a witness's testimony, and that the jury instruction on self-defense was deficient on the subject of "duty to retreat." We affirm.

1. *Background.* Based on the evidence presented at trial, the jury were entitled to find the following. The victim and the defendant had been friends for years, and one-time roommates. They worked together at Turner Fisheries in the Westin Copley Hotel, the victim as a bartender and the defendant as a line cook. A new bartender, Anna Davis, started working at the restaurant, and the defendant took a romantic interest in her. When the victim and Davis became friends and the defendant's romantic interest went unrequited, the defendant grew jealous of the victim. As time went by, the defendant grew increasingly angry and resentful of the victim. The defendant believed that the victim had been talking behind his back and that the victim might have said something to Davis to make her not want to date the defendant.

The defendant told Frank Neugebauer, the head chef, about his problems with the victim. The defendant was "quite aggravated" when he told Neugebauer, "I can't take it anymore," and, "One day I [am] going to get him." Neugebauer urged the defendant to see him if he had any problems with the victim.

On the day of the victim's death, the defendant's anger was boiling over. He was neglecting his kitchen duties and acting aggressively toward other restaurant staff. At some point that afternoon, the defendant told a coworker to tell the victim to "[s]top talking shit about me," and to tell him, "If you have any balls, come talk to me face to face." When the victim arrived at work, the coworker informed him that the defendant was mad at him. The victim was "not extremely upset about it," but replied, "Oh, really? He doesn't like it, but it's okay for him to talk behind my back."

Later that afternoon, the victim came into the kitchen and argued with the defendant in Spanish. The defendant left his work station, with a long kitchen knife in hand. Watching this unfold, Hemid Bouez, a line cook, yelled, "Stop, Ivan. Stop, Ivan," but the defendant continued approaching the victim, who

was backing up toward the door. Bouez hurried over and saw the victim lying on his back with the defendant over him, stabbing him repeatedly. Bouez grabbed the defendant and tried to pull away his knife-wielding hand. Another line cook rushed over, saw Bouez trying to pry the defendant off the victim, cried out, "Stop, Ivan. Stop, Ivan," and pried the knife out of the defendant's hand. The victim was lying on the floor with his eyes open, and the chest area of his uniform was bloodied. He was gasping for breath and asked for someone to call 911. He died shortly after.

The defendant had stabbed the victim four times, with the fatal wound being to the right side of his chest. The knife went four to six inches deep into his chest, fracturing his fifth rib and some cartilage on his sixth rib, and going through a lung, the superior vena cava, and, finally, the aorta. He also suffered a cut to his right ring finger, consistent with trying to defend himself. The second stab wound was to the back of his right thigh, consistent with being stabbed with his knees drawn up to his chest. The third wound was to the front of the right thigh near his hip, and the fourth one was on the outside of his right arm.

Once the defendant was pried off the victim, he stood motionless, white, and in "shock," not responding to Bouez's frantic question, "What the fuck . . . did [you do]?" He had blood covering the front of his shirt. He pulled out his cellular telephone, dialed, gave it to Bouez, and said, "Call my mother."

Moments later, security arrived and began to perform cardiopulmonary resuscitation on the victim. Neugebauer had been summoned into the kitchen, where he took the defendant aside and asked him why he had attacked the victim. The defendant said that the victim "came over. He irritated [me]," and that the victim asked him, "You want to do something about it?" The defendant replied, "Let's do it." The defendant told Neugebauer, "They lock me away for a long time now." When the defendant asked if he could have a cigarette, Neugebauer went with him to the loading dock. While there, the defendant told Neugebauer, "It was meant to be," and "I will be gone for a long time."

When the police arrived, Officer Paul DeLeo, Jr., noticed that

the defendant was all white but calm; his chef's uniform had fresh blood on it. He had a visible injury to his upper right cheek, but no other injuries. The defendant refused medical treatment. The defendant was arrested at the scene.

2. *The defense.* According to the defendant, he was working in the kitchen when the victim came in "yelling and screaming." The victim was loud and angry, and started talking about a woman named Angela Hanks, who used to work at the restaurant. He told the defendant, "Forget about her. She doesn't love you. It's me the one she wants. It's me the one she wants." The victim started looking around the kitchen; the defendant thought he was looking for something to throw at him. The defendant tried to calm the victim down and threatened to call Neugebauer. The victim reached for the defendant's knife, but the defendant grabbed it and put it by his side. The defendant "marched" past the line cooks, and the victim yelled, "He's got a knife. He's got a knife." When the defendant got closer to the victim, the victim twice hit him on the head with a metal bowl. The defendant tried to take it away, and the victim threw the bowl at him. The victim then grabbed a knife from a work station and ran at the defendant, swinging the knife. Cornered against the wall, the defendant stabbed the victim in the chest, and they both fell to the ground.

On the ground, the fight continued and the victim bit the defendant's face. Bouez tried to pull the defendant off the victim, but the victim was biting his face. Bouez eventually got the defendant off the victim; the victim was "shaking." The defendant knew the victim's condition was "bad," and he had a busboy call 911.[1]

3. *Discussion.* a. *The prosecutor's cross-examination.* The defense proceeded on a theory of self-defense. In support of that defense, the defendant testified on direct examination that the victim twice hit him on the head with a metal bowl and ran toward the defendant swinging a knife. On cross-examination, the prosecutor asked whether he had told Neugebauer that the victim had attacked him with a bowl and a knife, to which the defendant replied that he had not. The prosecutor then asked,

[1]The defendant also called as a witness Officer Fred Kennedy, who corroborated the defendant's claim that he had been bitten.

"In fact, you never told anybody that?" The defendant again replied that he had not.

At sidebar, the defendant objected and moved for a mistrial based on his claim that the prosecutor's question unfairly commented on the defendant's right to remain silent. The prosecutor explained that his purpose was to emphasize that the defendant had not told his coworkers about the victim's attack,[2] and not to suggest that he passed up an opportunity to offer this exculpatory explanation to the police. Because the prosecutor did not intend to offer in evidence the statement the defendant made to Officer Richard Moriarty, the prosecutor, at the judge's request, clarified through the defendant that he had not told his coworker about the bowl and knife. The judge denied the motion for a mistrial and noted the defendant's objection.

The defendant claims that the prosecutor's cross-examination ran afoul of the proscription against the use of a defendant's post-Miranda silence to impeach him. We disagree. In *Doyle* v. *Ohio*, 426 U.S. at 618, the United States Supreme Court held that the due process clause of the Fourteenth Amendment to the United States Constitution prohibits impeachment on the basis of a defendant's silence following Miranda warnings.[3] The Court held that such impeachment was fundamentally unfair because Miranda warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. *Ibid.*

Here, as clarified by the prosecutor, the defendant failed to mention the victim's bowl and knife attack to his coworkers when he was asked about the stabbing. This omission or silence occurred prior to his arrest and prior to his being advised of the Miranda warnings. The due process prohibition in *Doyle* neither contemplates nor extends to impeachment of a defendant with his pre-Miranda silence. *Jenkins* v. *Anderson*, 447 U.S. 231, 240 (1980).[4] Because no governmental action induced the defendant

[2]After the stabbing, the defendant spoke to both Bouez and Neugebauer.

[3]The case involved two defendants who made no postarrest statements about their involvement in the crime. Each testified at trial that he had been framed. On cross-examination, the prosecutor asked the defendants why they had not, upon their arrests, told the police that they had been framed. *Doyle* v. *Ohio*, *supra* at 613-614.

[4]In *Jenkins*, the Court left it to the individual States to formulate their own

to remain silent before his arrest, the fundamental unfairness present in *Doyle* is absent here. *Jenkins* v. *Anderson, supra.* See *Commonwealth* v. *Thompson*, 431 Mass. 108, 117 n.6 (2000), cert. denied, 531 U.S. 864 (2000) (*Doyle* not implicated by non-custodial, pre-Miranda silence); *Commonwealth* v. *Guy*, 441 Mass. 96, 106 (2004) ("The prohibition of *Doyle* applies only to police interrogations"); *Commonwealth* v. *Nolin*, 448 Mass. 207, 221 (2007) (the protection afforded by *Doyle* is not applicable where the defendant's statements are made to a friend and not in response to police interrogation); *Commonwealth* v. *Leach*, 73 Mass. App. Ct. 758, 766 (2009) (*Doyle* not implicated by prosecutor's argument regarding certain omissions from a conversation that took place among the defendants). Not having received the Miranda warnings at the time in question, the defendant had not yet become the beneficiary of the implicit assurances embodied within them. See *Fletcher* v. *Weir*, 455 U.S. 603, 607 (1982); *Brecht* v. *Abrahamson*, 507 U.S. 619, 628 (1993).[5]

Despite the prosecutor's clarification of his question, the

---

rules of evidence "to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." *Jenkins* v. *Anderson, supra* at 239. In *Commonwealth* v. *Nickerson*, 386 Mass. 54, 62 (1982), as a matter of common law, the Supreme Judicial Court determined that impeachment of a defendant, as opposed to a defense witness, with the fact that he had an opportunity to tell the police his story prior to his arrest must be approached with caution. If undertaken, there must be a foundation laid that it would have been "natural" to expect the defendant to speak in such circumstances. *Ibid.* See Mass. G. Evid. § 613 note, at 203-204 (2010). The requirement that a foundation be laid is not applicable in these circumstances because the prosecutor was not questioning the defendant about what he failed to tell the authorities but, rather, what he failed to tell his coworkers. See *Commonwealth* v. *Nickerson, supra* at 57 (pointing out that different situation exists in regard to silence with authorities versus silence before other witnesses). See also *Langan* v. *Pianowski*, 307 Mass. 149, 151-152 (1940) (appropriate to impeach a witness by showing that he was silent in circumstances where he would be expected to disclose some fact and did not do so). The defendant does not argue otherwise.

[5]In support of his claim, the defendant relies on *Commonwealth* v. *Haas*, 373 Mass. 545, 559-560 (1977), and *Commonwealth* v. *Egardo*, 426 Mass. 48, 52 (1997), neither of which is apposite. In both cases, the Supreme Judicial Court found fault in the Commonwealth's use of postarrest silence which occurred during custodial interrogation by the police. Here, as clarified, the Commonwealth made use of the defendant's omission from a conversation he had with a coworker before the police had even arrived.

defendant claims that because Neugebauer testified that he saw the defendant in custody (after he had been advised of his rights), and that Neugebauer and another witness had both been interviewed by the police, "the jury would naturally infer that the defendant had been interviewed by the police." Because of that inference, the challenged question would be understood as an improper comment on the defendant's post-Miranda right to remain silent.

Even if we indulged the possibility of the inference urged by the defendant, the claim is without merit. The fatal problem with this argument, as recognized by the trial judge, is that the defendant did *not* remain silent after he received the Miranda warnings.[6] After the defendant told Officer Moriarty that he had been in a fight, Moriarty asked, "And [the victim] got cut?" The defendant responded, "I had a knife." Upon hearing this, Moriarty handcuffed the defendant and read him the Miranda rights off a card. The defendant refused Moriarty's offer to have the rights read in Spanish.[7] Moriarty then asked, "How did he get cut?" The defendant responded, "I had a knife," but did not respond to the question, "So you cut him?" whereupon Moriarty ceased asking questions.

The animating concern in *Doyle* was that a defendant's silence in the wake of receiving the Miranda warnings may be nothing

---

[6]In the defendant's brief, appellate counsel states that "[t]he defendant did not answer any further questions after being given his Miranda rights." However, this statement is directly contradicted by the record at the suppression hearing (which counsel references) and the record at trial, where, in response to the defendant's motion for a mistrial, the judge made repeated note of the defendant's post-Miranda statement to Officer Moriarty, a fact trial counsel acknowledged. In addition, appellate counsel's statement is contradicted by the defendant's motion to suppress and memorandum of law in support thereof, the Commonwealth's memorandum of law in opposition thereto, and the motion judge's findings of fact and memorandum of decision. All these documents referenced the defendant's request to suppress the statements he made both before and *after* he received Miranda warnings. The materiality of the counsel's inaccurate statement is plain. See Mass.R.Prof.C. 3.3(a)(1), 426 Mass. 1383 (1998) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal).

[7]The defendant has not challenged the judge's pretrial determination that the defendant understood the Miranda rights read to him in English, and that the defendant's waiver of those rights was knowing, intelligent, and voluntary prior to the statement he made to Officer Moriarty. See *Commonwealth v. Tam Bui*, 419 Mass. 392, 396-397, cert. denied, 516 U.S. 861 (1995).

more than an exercise of those rights, which renders his silence "insolubly ambiguous" on questions of guilt or innocence. *Doyle* v. *Ohio*, 426 U.S. at 617. Where a defendant has received an implicit assurance via the Miranda warnings that a choice to remain silent does not bring with it any legal consequence, that silence cannot be used as a tool for impeachment. *Id.* at 618. However, "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson* v. *Charles*, 447 U.S. 404, 408 (1980). The defendant had a constitutional right to silence, not a right to tell a story and then avoid explaining crucial omissions by stating they were an exercise of the right to silence. The omission of facts from one statement that are contained in another statement is not silence within the meaning of *Doyle*. *Anderson* v. *Charles*, 447 U.S. at 409. See *Commonwealth* v. *Lavalley*, 410 Mass. 641, 648-650 (1991); *Commonwealth* v. *McClary*, 33 Mass. App. Ct. 678, 685 (1992), cert. denied, 510 U.S. 975 (1993); *Commonwealth* v. *Donovan*, 58 Mass. App. Ct. 631, 637 (2003).

In light of these precepts, the challenged question, even without the clarification it received, could not have been an improper comment on the defendant's post-Miranda silence, because he did not remain silent. Even though Moriarty did not testify regarding the post-Miranda statement, the defendant cannot claim the benefit of an induced silence that did not occur. There was no error.

b. *The judge's instruction on witness testimony.* The defendant claims that the judge erred in instructing the jury that when a witness adopts his prior statement, the prior statement may only be used to assess credibility. We disagree, as the argument misapprehends what occurred at trial.

During his direct examination, Neugebauer testified that when he asked the defendant why the defendant had attacked the victim, the defendant stated that he asked the victim, "You want to do something about it? Let's do something about it." On cross-examination, when asked about his grand jury testimony on the subject, Neugebauer corrected his trial testimony to reflect what he had told the grand jury, i.e., that it was the victim and not the defendant who had said, "Do you want to do something about

it," to which the defendant replied, "Let's do it." Neugebauer further clarified that the true sequence of the speakers was as he had told the grand jury.

During the charge conference, in reference to the judge's proposed instruction on prior inconsistent statements not being proof of any given fact, the defendant requested the judge to add the words "unless the witness has adopted the prior statement as true." The judge disagreed with the request and thought the suggested language was confusing because if the witness adopted the prior statement, it becomes his present testimony as substantive evidence. The defendant's objection was noted at the charge conference, and after the jury received its instructions.

During her instructions to the jury, the judge explained that a witness's prior inconsistent statement is relevant only to credibility and that it is not proof of the facts contained within the statement. This was a correct statement of the law. See *Commonwealth* v. *Daye*, 393 Mass. 55, 66 (1984). While the judge did not tack on the language the defendant requested, she did not, contrary to the defendant's claim on appeal, instruct the jury that if a witness adopts a prior statement, it would only be relevant to credibility determinations. The manner in which a judge instructs the jury is a matter of discretion, *Commonwealth* v. *Roberts*, 378 Mass. 116, 130 (1979), and the judge here did not abuse her discretion.

When the jury instructions are reviewed as a whole, as we are required to do, *Commonwealth* v. *Miller*, 457 Mass. 69, 75 (2010), what emerges is a thorough explanation of what constitutes evidence that the jury may consider. In particular, the judge made it abundantly clear that witness testimony was one form of evidence for the jury to consider. She further instructed that questions are not evidence and that only a witness's answers constitute evidence. Given that Neugebauer's trial testimony was that his grand jury testimony provided the true sequence of the conversation between the defendant and the victim, we do not see how the jury could conclude that this testimony was not to be accorded its full probative value. See *Commonwealth* v. *Jones*, 432 Mass. 623, 627 (2000) (where a witness adopts an earlier inconsistent statement as true, the adopted statement acquires full probative value).

c. *Self-defense instruction.* Finally, the defendant claims that

it was error for the judge not to define, within the self-defense instruction, what is meant by "all proper means to avoid physical combat." Specifically, the defendant requested that the judge instruct the jury that "[t]he defendant need not retreat until he can do so in complete safety and need not do so when he would increase the danger to his own life." The judge declined the request, and noted the defendant's objection when the instruction was not given.[8] Because the issue was properly preserved, we review for prejudicial error. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

On the issue of the duty to retreat within self-defense, the judge, following the model jury instruction nearly verbatim, instructed as follows:

> "Deadly force is force that is intended or likely to cause death or great bodily harm. In order to defend oneself with a dangerous weapon likely to cause serious injury or death or to use deadly force, the person using the weapon or deadly force must have a reasonable apprehension of great bodily harm or death and a reasonable belief that no other means would suffice to prevent such harm. Put another way, the proper exercise of self-defense means that a person in the defendant's circumstances would reasonably believe that he was about to be attacked and that he was in immediate danger of being killed or seriously injured and that there was no other way to avoid the attack.

> "A person using a dangerous weapon or deadly force in self-defense must also have actually believed that he was in imminent danger of serious harm or death. A person may not use force in self-defense until he has availed himself of all proper means to avoid physical combat. A person who reasonably but mistakenly believes that he is in imminent danger of serious bodily harm or death and that he has used all proper means to avoid the use of force may still use deadly force to defend himself."

In general, when a judge employs the Model Jury Instructions on Homicide (1999), which have been approved by the

---

[8]We disagree with the Commonwealth's argument that only a portion of the requested instruction was preserved for appeal.

Supreme Judicial Court, there is no need to instruct further on the concepts contained therein. See *Commonwealth* v. *Phillips*, 452 Mass. 617, 632 (2008); *Commonwealth* v. *Mercado*, 456 Mass. 198, 206-208 (2010). Here, while it is true that a defendant need not retreat when to do so would increase the danger to his own life, see *Commonwealth* v. *Pike*, 428 Mass. 393, 398 (1998), the judge's use of the more general language of "all proper means to avoid physical combat" properly embodies that concept. Indeed, *Pike* was decided just one year before the Model Jury Instructions on Homicide were published.

Furthermore, in support of the requested instruction, the defendant relied on *Commonwealth* v. *Peloquin*, 437 Mass. 204 (2002), which does not mandate the use of the defendant's suggested language. In fact, it is only in dicta that the court discusses the issue at all. *Id.* at 211-212. There, the court noted that the judge had instructed the jury that "the defendant must have done everything that was reasonable in the circumstances to avoid physical combat before resorting to force," and that when deciding whether the defendant's use of force to protect himself was reasonable, the jury could consider what "escape routes" were available, and that a person under attack "may have to decide what to do quickly and under emotional strain." *Ibid.* It was these instructions, when taken as a whole, that explained "that a defendant need not retreat unless he can do so in safety, and need not do so when he would increase the danger to his own life." *Id.* at 212.[9] As such, the judge here did not err by declining further to define the parameters of retreat.

*Judgment affirmed.*

---

[9]The defendant also relies on *Commonwealth* v. *Gregory*, 17 Mass. App. Ct. 651, 652-654 (1984), where a jury charge on self-defense improperly implied that the defendant had a duty to retreat from an unlawful intruder in the defendant's home. That reliance is misplaced in this case, where the "castle" law has no application. See G. L. c. 278, § 8A.