NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1584                                        Appeals Court

COMMONWEALTH vs. BENJAMIN RIVERA.

No. 18-P-1584.

Hampden.     September 17, 2019. - April 9, 2020.

Present: Vuono, Meade, & Sullivan, JJ.


Homicide. Firearms. Self-Defense. Practice, Criminal,
     Admissions and confessions, Instructions to jury.
     Constitutional Law, Admissions and confessions, Self-
     incrimination. Evidence, Admissions and confessions, Self-
     defense, Consciousness of guilt.


     Indictments found and returned in the Superior Court
Department on August 7, 2013.

     The cases were tried before Daniel A. Ford, J.


     Robert F. Hennessy for the defendant.
     Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.


     VUONO, J. Following a jury trial in the Superior Court,

the defendant was convicted of murder in the second degree

stemming from the shooting death of Angel Llorens on May 22,

2013, in Springfield.[1] He also was convicted of unlawful possession of the firearm and ammunition that he used during the shooting. At trial, the defendant did not dispute that he had shot Llorens. He testified on his own behalf and claimed that he was acting in self-defense. However, when the defendant was interviewed by the police about two weeks after the shooting, he said that he was not present when Llorens was shot but, rather, was at home with his step-father. In his opening statement and closing argument, the prosecutor commented on the discrepancy between the defendant's testimony at trial and the statement he gave to the police. The defendant claims that these remarks, to which there was no objection, violated his right to remain silent. He also claims error in the admission of portions of his interview that constitute accusatory questions and denials thereto, and in the judge's instructions on reasonable provocation and sudden combat. Lastly, the defendant argues that the combination of these alleged errors warrants reversal of his convictions. We affirm.

   1. Background. a. The Commonwealth's case-in-chief. The Commonwealth presented evidence from which the jury could have found the following facts. On the evening of May 22, 2013, the defendant was with a group of friends and acquaintances at the

---

   [1] The indictment charged murder in the first degree.

home of Lee Hutchins, Jr., at 53 Daytona Street in Springfield. Some of the persons at the gathering were members of a local "car club" that repaired and raced automobiles. Llorens lived close by and was a member of a rival car club. Shortly before 10 P.M., Llorens came home and parked his car in front of his building. The vehicle had a sticker bearing the rival club's logo. The sticker caught the attention of some of Hutchins's friends, one or two of whom decided to play a prank on Llorens by stealing the sticker. Llorens, who apparently observed the theft from inside his home, came outside and confronted the group. Llorens was angry. There was evidence that Llorens said he was going to get a gun and that he briefly returned to his apartment. When the conflict began, Hutchins told the group not to worry because he had a gun. After Hutchins retrieved the gun, the defendant took it from him and put it "on his hip." Thereafter, Hutchins and one other person, Abinel Zayas, approached Llorens and offered to pay for the sticker. Llorens agreed to be compensated, and as Hutchins began to walk away to retrieve his wallet, the defendant approached with the gun drawn. Llorens, who was now smoking a cigarette, saw the defendant and said, "I'm not scared." The defendant then shot Llorens four times in rapid succession. Immediately thereafter, the defendant departed in a car driven by his stepfather, who had been "hang[ing] out" with the group at Hutchins's house. As

he was leaving, the defendant told Hutchins's father, who had come out of the house upon hearing the shots, "[Y]ou didn't see nothing, you don't know nothing." Hutchins, who testified pursuant to a cooperation agreement, was distraught after the shooting. He claimed that the problem over the sticker had been "squashed" and that the defendant shot Llorens "for nothing."

The police arrived quickly and transported Llorens to the hospital, where he died from his wounds. The ensuing investigation revealed that Llorens did not have a firearm when he was shot. In addition, the Commonwealth's forensic evidence established that although Llorens had a knife in his back pocket, it had not been removed during the incident.

About two weeks after the shooting, the defendant voluntarily went to the Springfield police station, where he was arrested. After being read his Miranda rights, the defendant agreed to speak to Detectives Kevin Lee and Anthony Pioggia. A redacted video recording of the defendant's interview was played for the jury and admitted in evidence.[2] The detectives did not initially inform the defendant that he was charged with Llorens's murder. The interview began with a discussion about the defendant's hobbies. The defendant explained that although he liked street racing, he was not a member of a car club and

---

[2] The record provided to this court contains only a transcript of the recording that was played for the jury.

did not frequent the neighborhood (Daytona Street and Belmont Avenue) where the shooting occurred. He said he did not know Hutchins and had no reason to be in Hutchins's neighborhood, claiming, "I don't . . . go up there. I don't got no business up there. No family, no friends."

About midway through the interview, in response to the defendant's inquiry as to why he was being asked these questions, Detective Pioggia told the defendant that he was being charged with "killing a kid on Belmont and Hollywood." The defendant responded, "Hell, no, that's crazy. . . . No, that is crazy."[3] The interview continued and the defendant answered more questions about racing cars and whether he knew certain persons. A short time later, Detective Pioggia again stated that the defendant was charged with the "killing of this kid on Belmont Avenue," and the defendant again responded, "Crazy." The interview then focused on the defendant's whereabouts on the night of the murder. During this portion of the interview, the defendant stated: "I just don't know where you all get me killing somebody." Detective Pioggia referred to the charge again and said: "Well, you have been identified as

---

[3] The defendant also said: "[K]illing someone, that's too much, man. . . . I thought we was talking about street racing, breaking laws or whatever."

killing -- as killing this kid."  This time, the defendant simply shook his head in response.

Thereafter, the defendant was shown a number of photographs of persons who had been at Hutchins's house on the night of the shooting.  When the detectives showed the defendant photographs of Llorens and Hutchins, the defendant claimed that he had never seen either individual and wrote "never seen before" across the bottom of both photographs.  The defendant then acknowledged that he had heard about the murder on the night that it happened and said he had been home on Armory Street with his stepfather. According to the defendant, the two had been drinking, and therefore, he could not remember who told him about the shooting.  At one point, the defendant said he was told "somebody got shot," not "killed."  After additional questioning, the defendant terminated the interview.

b.  The defense.  As noted, the defendant proceeded on a theory of self-defense.  During his direct testimony, he acknowledged that he lied to the police when he was questioned following his arrest because he was "scared" and "ignorant."[4] According to the defendant, when Hutchins approached Llorens in an attempt to settle the dispute, Llorens reached behind his

_____

[4] The defendant stated:  "Well, I was scared.  Being ignorant.  I guess I thought I would get away with something.  I was being selfish."

back.  The defendant testified that he believed Llorens had a gun.  Hutchins and the defendant talked to Llorens and offered to pay for the sticker, but Llorens was not listening.  The defendant then told everyone to return to the porch and told Llorens not to follow them.  By this time, the defendant had the gun in his hand.  Llorens lunged, and the defendant "let out a shot."  Llorens kept coming toward the defendant and said he was not scared.  Fearing for his life and the lives of the others present, the defendant then shot Llorens three more times.[5]

2.  <u>Discussion</u>.  a.  <u>The defendant's right to remain silent</u>.  In his opening statement, the prosecutor referred to the defendant's interview and stated, among other things, "You will not hear the word self-defense come from his mouth during that meeting."[6]  Later, in closing argument, the prosecutor drew attention to the variance between the defendant's statements to the police and his testimony at trial.  At one point, the prosecutor said:  "He doesn't tell them, hey, you got it all wrong, this guy was crazy, I had to do it.  No, he tries to get

---

[5] The defendant also called as witnesses two of the persons who were present on the porch at 53 Daytona at the time of the shooting -- his stepuncle, Ramon Arocho, and his stepfather, Celido Nunez.

[6] The theory of the defense was known prior to the commencement of the trial.

away with something first."[7]  The defendant argues that the prosecutor's references to the defendant's failure to tell the police that he shot Llorens in self-defense violated his right to remain silent.  Because there was no objection to the admission of the challenged remarks, we review the defendant's claim under the substantial risk of a miscarriage of justice standard.  Commonwealth v. Womack, 457 Mass. 268, 273 (2010).

In Doyle v. Ohio, 426 U.S. 610 (1976), the United States Supreme Court held that a defendant's silence after the police have given the warnings mandated by Miranda v. Arizona, 384 U.S. 436 (1966), may not be used against that defendant.  Doyle, 426 U.S. at 619.  "[T]o do so would 'penalize' the invocation of the right to silence."  Commonwealth v. Waite, 422 Mass. 792, 797 (1996) (applying Doyle).  However, when a defendant waives his right to remain silent after being apprised of his Miranda rights and agrees to speak with police, it is permissible for a prosecutor to comment on omissions from the defendant's post-

---

[7] The prosecutor further stated:

"And you saw his reaction when they tell him you're charged with murder.  Cool, calm, collected.  He doesn't seem to be easily frazzled or phased.  Oh, that's crazy.  No, not me.  Have you ever been down to Belmont and Daytona?  No, I don't go down there.  No, no, that's crazy.  Do you know this man?  And watch when they show him the picture of Lee Hutchins and Angel Llorens.  That picture is in front of him for a millisecond.  Nope, don't know him.  It just rolls off the tongue easily."

Miranda statements.  See <u>Womack</u>, 457 Mass. at 277-278 (no <u>Doyle</u> violation where defendant had waived Miranda rights and prosecutor argued that failure to disclose to police his alibi offered at trial was evidence that alibi was false); <u>Commonwealth</u> v. <u>Sosa</u>, 79 Mass. App. Ct. 106, 113 (2011) ("The defendant ha[s] a constitutional right to silence, not a right to tell a story and then avoid explaining crucial omissions by stating they were an exercise of the right to silence").  See also <u>Commonwealth</u> v. <u>Snell</u>, 428 Mass. 766, 772-773, cert. denied, 527 U.S. 1010 (1999) (right to remain silent not violated where prosecutor commented in opening statement that, when police informed defendant of wife's death, he "said nothing" other than that he was out of State); <u>Commonwealth</u> v. <u>Lavalley</u>, 410 Mass. 641, 648-649 (1991) (defendant's failure to tell police in postarrest statement that he was with rape victim and had intercourse with her constituted false statement, and prosecutorial comment thereon was permissible at rape trial where defense was consent); <u>Commonwealth</u> v. <u>Donovan</u>, 58 Mass. App. Ct. 631, 639 (2003) (not improper for prosecutor to comment on variance between postarrest statements and trial defense, including failure to mention to police that sexual encounter was consensual where defense at trial was consent).

Here, as in the cases cited <u>supra</u>, the defendant did not remain silent.  After waiving his Miranda rights, the defendant

spoke voluntarily with the police and answered questions on a variety of topics.[8]  During the interview, in an apparent effort to deflect attention from himself and to establish an alibi, the defendant made numerous statements that the jury could have found were false.  The proscription of Doyle does not apply in these circumstances.  As we have previously stated, "[t]he omission of facts from one statement that are contained in another statement is not silence within the meaning of Doyle."  Sosa, 79 Mass. App. Ct. at 113.  Consequently, the challenged remarks did not amount to a constitutional violation.

The defendant also argues that a Doyle error occurred because he ultimately exercised his right to remain silent and terminated the interview.  This claim is equally unavailing.  As the defendant acknowledges, the "sine qua non of a Doyle violation is the government's use of the defendant's silence against him" (emphasis original).  Waite, 422 Mass. at 798.  Here, the fact that the defendant ultimately terminated the interview is of no consequence because the invocation of his right was not used against him.

This case is distinguishable from Commonwealth v. Clarke, 48 Mass. App. Ct. 482 (2000), on which the defendant relies.  In

---

[8] There was no direct testimony regarding the length of the interview.  We note, however, that it took about thirty-three minutes to play the redacted video for the jury.

Clarke, the defendant, who was charged with aggravated rape, waived his Miranda rights and agreed to be questioned by a Boston police detective. Id. at 484. During the interview, the defendant claimed that he did not know the victim. Id. at 485. Upon being confronted with incriminating information, the defendant ended the interview. Id. Later, at trial, the defendant took a different position. Id. at 484. He said that the victim was a prostitute and that they had had a consensual sexual encounter. Id. We held that the defendant's silence was used against him when the prosecutor argued that the defendant had "stopped answering . . . questions because he realized that he had been caught in a lie and, for that reason[, he] 'changed his defense.'" Id. at 487. The prosecutor also implied that the defendant's refusal to answer further questions was evidence that he had fabricated his testimony. Id. Here, by contrast, the prosecutor did not argue or imply that the defendant's invocation of his right to remain silent was evidence of his guilt. Instead, the prosecutor argued, within the bounds of proper argument, that the defendant's failure to tell the police that he shot Llorens in self-defense was, as the defendant himself had testified, a "lie[]."[9]

_____

[9] The defendant's reliance on United States v. Caruto, 532 F.3d 822 (9th Cir. 2008), also is misplaced. In that case the defendant gave a brief postarrest statement lasting five to seven minutes before invoking her right to remain silent. Id.

b.  Admissibility of accusatory questions and defendant's denials.  For the first time on appeal, the defendant claims that the video recording of his interview with the police was insufficiently redacted.  His primary argument concerns Detective Pioggia's statements that the defendant was charged with "killing a kid" and the defendant's denials in response to those accusations.  He contends that these exchanges should have been redacted from the recording because they constitute inadmissible hearsay.  The defendant also contends that it was error to admit those portions of his interview where he denied having been or having had reason to be in the area where the shooting occurred and denied knowing Llorens or Hutchins.  The defendant further asserts that these alleged errors were exacerbated by the prosecutor's closing argument and the judge's instruction on consciousness of guilt.

The admissibility of the video recording (and the statements contained therein) was the subject of a motion in limine filed by the Commonwealth prior to trial.  At the hearing on the motion, the Commonwealth argued that because the defendant's statements were false, they were admissible as evidence of consciousness of guilt.  The prosecutor also

at 824.  She then testified at trial and provided additional details that were not inconsistent with the statements made during her custodial interview.  Id. at 830-831.

requested an instruction on consciousness of guilt.  Defense counsel objected to the admission of the video recording, but only on the ground that the defendant's statements were not voluntary.  The judge initially reserved decision on the motion and subsequently admitted the recording in evidence with no further objection.  In addition, without further objection, the judge instructed the jury as the Commonwealth had requested, stating that if they found that the defendant had made false statements to the police, they could consider those statements as evidence of consciousness of guilt.[10]  Given the absence of any objection, we review the defendant's argument to determine whether any error created a substantial risk of a miscarriage of justice.  Womack, 457 Mass. at 273.

We first address Pioggia's statements that the defendant was charged with "killing" Llorens, and the defendant's denials ("that's crazy").  The long-standing rule in Massachusetts is that "[e]xtrajudicial accusatory statements made in the presence

---

[10] The judge also instructed the jury that it was not necessary to infer consciousness of guilt from any false statements during the interview; that they should do so only if the inference was reasonable; and that the jury were to decide what weight to give any such inference.  In addition, the judge noted that there could be numerous reasons why an innocent person might make false statements to the police; that such conduct did not necessarily reflect feelings of guilt; that even feelings of consciousness of guilt may not prove guilt in fact; and that such evidence alone was not enough to prove actual guilt.

of a defendant, which he has unequivocally denied, are hearsay and inadmissible as evidence of guilt in the Commonwealth's case in chief" (footnotes omitted). Womack, 457 Mass. at 272. See Commonwealth v. Spencer, 465 Mass. 32, 46 (2013) ("the proper rationale for excluding accusations and denials is that they constitute inadmissible hearsay"). However, evidence of a defendant's out-of-court statement denying culpability may be admissible for other nonhearsay purposes. For example, in Commonwealth v. Cruz, 373 Mass. 676, 691-692 (1977), the defendant's unequivocal denials in response to police accusations were admitted for the purpose of showing the defendant's state of mind and the voluntariness of his confession. In Commonwealth v. Bonnett, 472 Mass. 827 (2015), the court concluded that, where "the evidence suggested, as defense counsel conceded, that [the defendant's statement to police denying that he had been at the location of the shooting under investigation] was a 'false statement,' [it was] admissible 'to show consciousness of guilt.'" Id. at 839, citing Commonwealth v. Lavalley, 410 Mass. at 649. The court's decision in Lavalley is also instructive. In that case, the defendant, who was convicted of rape, initially told the police that he had been drinking with the victim and a few friends and that he had gotten into an argument with the victim. Id. at 647. He did not say anything about engaging in sexual

intercourse with the victim at that point, thereby implicitly denying the allegation of rape, but he later testified at trial that the two had had a consensual sexual encounter that the victim had initiated.  Id. at 648.  In Lavalley, as here, the prosecutor asked the judge to instruct on consciousness of guilt, and the judge did so over the defendant's objection.  Id. The court concluded that the judge properly instructed the jury. Id. at 649-650.

Returning to the circumstances presented here, we acknowledge that Detective Pioggia's statements informing the defendant that he was charged with murder and the defendant's unequivocal denials to those accusations are hearsay.  See Spencer, 465 Mass. at 46.  However, even if we were to assume that the accusations and denials should have been redacted from the recording, there was no risk of a miscarriage of justice. This is not a case where the defendant unequivocally denied accusations by the police during an interview and continued to deny the charges against him at trial.  Contrast Commonwealth v. Diaz, 453 Mass. 266, 273-274 (2009), overruled in part on other grounds by Womack, 457 Mass. at 274.  Here, as we have discussed, the defendant gave one version of events to the police and then testified to a different -- inconsistent --

version at trial.[11] In light of the defendant's trial testimony, the defendant's statements to the police in which he denied killing Llorens and his failure to disclose to the police that he shot Llorens in self-defense were part of the apparently false narrative, probative of consciousness of guilt, that was already before the jury. See Lavalley, 410 Mass. at 649 (where defendant offered one version of events during custodial interview and another at trial, omissions in defendant's statements during interview constituted false statements admissible at trial to show consciousness of guilt). Consequently, the failure to redact the video recording to exclude Detective Pioggia's accusations and the defendant's denials did not cause justice to miscarry.[12]

The defendant's second contention, that the video recording should have been redacted to exclude his statements that he did

---

[11] For this reason, the defendant's reliance on Commonwealth v. Diaz, 453 Mass. 266, for support is misplaced. The premise of the defense in Diaz was misidentification, and as a result, there was no discrepancy between the defendant's denial of the charge of murder when he was interrogated by police and his defense at trial. Id. at 270, 273.

[12] The defendant claims that the admission of this evidence "harmed" his claim of self-defense because it rendered his testimony at trial less credible. However, the defendant made numerous apparently false statements, each of which undermined his credibility at trial. Moreover, contrary to the defendant's assertion that there was little evidence to rebut his claim of self-defense, the Commonwealth presented ample evidence, which included testimony from witnesses who were at the scene, demonstrating that the defendant did not act in self-defense.

not know Llorens or Hutchins and did not frequent Hutchins's neighborhood, requires little discussion. Unlike the questions that implied that the defendant had killed Llorens, the questions seeking information about his routine and acquaintances did not accuse the defendant of criminal activity. See Commonwealth v. Cruzado, 480 Mass. 275, 278 (2018) (negative answers to questions that did not accuse defendant of criminal activity admissible). Accordingly, the defendant's statements denying familiarity with Llorens and Hutchins and denying that he had spent time in the area of the shooting were properly admitted. Id.

Finally, given our discussion supra, we reject the defendant's argument that it was improper for the prosecutor to comment on the defendant's omissions and his responses to the police upon learning of the charge against him. We further conclude that the judge properly instructed the jury on consciousness of guilt.

c. Jury instructions on voluntary manslaughter. The judge instructed the jury on voluntary manslaughter, which included an explanation of heat of passion on reasonable provocation and heat of passion induced by sudden combat. As to reasonable provocation, the judge instructed, inter alia:

> "[M]ere words, no matter how insulting or abusive, standing alone, do not constitute reasonable provocation.

"Physical contact, even a single blow, may amount to reasonable provocation. Whether the contact is sufficient will depend on whether a reasonable person under similar circumstances would have been provoked to act out of emotion rather than reasoned reflection."

As to sudden combat, the judge instructed:

"Sudden combat involves a mutual and sudden assault by both the deceased and the defendant. In sudden combat[,] physical contact, even a single blow, may amount to reasonable provocation. Whether the contact is sufficient will depend on whether a reasonable person under similar circumstances would have been provoked to act out of emotion rather than reasoned reflection."

Defense counsel objected, claiming that the instructions improperly suggested that some sort of physical contact had to be shown before the jury could find there was reasonable provocation. The objection was overruled. Because the issue was preserved, we consider whether there was error and, if so, whether the error was prejudicial. Womack, 457 Mass. at 273.

There was no error. The judge's instructions tracked the Model Jury Instructions on Homicide (2013) (Model Instructions) in effect at the time of the defendant's trial. "In general, when a judge employs the [Model Instructions], which have been approved by the Supreme Judicial Court, there is no need to instruct further on the concepts contained therein." Sosa, 79 Mass. App. Ct. at 115-116 (where trial judge used broad terminology in Model Instructions that encompassed more specific instruction sought by defense, not error for judge to decline to further expound upon instruction). See Commonwealth v.

<u>Phillips</u>, 452 Mass. 617, 632 (2008) (after quoting verbatim from Model Instructions, judge did not need to instruct further on elements of extreme atrocity or cruelty). See also <u>Commonwealth v. Deane</u>, 458 Mass. 43, 59 n.15 (2010) (refusal of requested instruction is error "only if the requested instruction . . . was not substantively covered in the jury charge").[13]

d. <u>Cumulative error</u>. Because there was no error in the Commonwealth's opening or closing remarks or in the jury instructions, and no substantial risk of a miscarriage of justice resulting from the admission of any portion of the defendant's recorded interview, there is no basis for the defendant's claim that the cumulative impact of the asserted errors requires a new trial.

<u>Judgments affirmed</u>.

---

[13] We acknowledge that the Model Jury Instructions on Homicide were revised in 2018 and the instruction on heat of passion on reasonable provocation (although not the instruction on heat of passion by sudden combat) now includes an explicit statement that physical contact is not necessary for reasonable provocation. See Model Jury Instructions on Homicide (April 2018), reprinted in Massachusetts Superior Court Criminal Practice Jury Instructions § 2.7, at 2-50 (Mass. Cont. Legal Educ. 2018). This revision, however, does not affect our conclusion that the judge did not err.